BURDICK, Chief Justice.
Travis Forbush and Gretchen Hymas, individually and as natural parents of McQuen C. Forbush and Breanna Halowell (Appellants), appeal the Ada County District Court’s grant of summary judgment to Sagecrest Multifamily Property Owners’ Association, Inc., and its President, Jon Kalsbeek (Respondents). Forbush and Halowell were overnight guests of a tenant who leased a unit at the Sagecrest Apartment Complex (Sagecrest). During the night, hazardous levels of carbon monoxide filled the unit, killing Forbush and injuring Halowell. Appellants brought tort claims against Respondents after the incident. The district court granted summary judgment to Respondents. We affirm in part, reverse in part, and remand.
I. FACTUAL AND PROCEDURAL BACKGROUND
This appeal concerns an incident in which a vent on a water heater clogged and caused the emission of hazardous levels of carbon monoxide in unit 4624 at Sagecrest on November 10, 2012. The incident killed eighteen-year-old Private First-Class McQuen C. *321 Forbush, a U.S. Marine; and injured eighteen-year-old Breanna Halowell. Forbush and Halowell were overnight guests of unit 4624⅛ tenant Adra Kipper.
Sagecrest consists of forty-eight separate buildings, each containing four apartments. When Sagecrest was built, Sagecrest Development, LLC, recorded the Declarations of Covenants, Conditions, and Restrictions (CCRs). The CCRs instruct that individuals or entities hold fee title to the separate buildings, each containing the four apartments. The CCRs grant these individuals or entities the “exclusive right” to maintain the interiors of the apartments they own. The unit owners are shareholders in the Sagecrest Multifamily Property Owners’ Association (POA), a non-profit corporation. The CCRs task the POA with maintaining the exterior grounds at Sagecrest, including the sidewalks, landscaping, common areas, and fences. By contrast, the CCRs task unit owners with maintaining the “entire interior” of the units they own. To meet these maintenance duties, the CCRs require both the POA and unit owners to employ the same property management company. To that end, the POA and unit owners entered into maintenance contracts with First Rate Property Management (FRPM) in March 2010.
In spring 2011, carbon monoxide concerns emerged at Sagecrest. Evidently, some tenants had reported smelling gas inside of their units. Intermountain Gas was contacted about these concerns and explained the problem was due to certain water heaters’ venting systems. Two types of water heaters were used at Sagecrest. Venting on one type had “a metal screen around the bottom of the tank.” Venting on the second type “d[id]n’t have a screen that goes around, but one in the middle on the bottom.” Venting on the second type was prone to clogging, which, in turn, caused carbon monoxide to emit. After meeting -with Intermountain Gas about the problem, FRPM surmised that “we just need to clean/vacuum off the screens and it will be fíne.”
Nonetheless, carbon monoxide concerns grew more serious that summer. In July 2011, Intermountain Gas was again contacted after another tenant reported smelling gas inside of her unit. Intermountain Gas described the carbon monoxide level as “deadly” and attributed it to the unit’s water heater. That same month, a professional plumber, Ben Davis, inspected the water heaters at Sagecrest, identified the problematic venting system, and advised that “these issues be solved before any tenants suffer health problems or death.” Thereafter, FRPM reasoned that more than just cleaning or vacuuming the screens was necessary, concluding “the only way to fix this problem without modifying the water heater is to replace them completely.”
Although the POA knew of the carbon monoxide concerns, it did not move to modify or replace the water heaters. As the POA’s President Jon Kalsbeek explained, “the water heaters are interior items of each unit” and, therefore, “an owners [sic] choice on how to handle this situation.” Even so, the POA, primarily through Kalsbeek, became involved with the carbon monoxide issue in several ways. Although the CCRs give unit owners the “exclusive right” over unit interiors, Tony Drost, FRPM’s President, testified that the POA, through Kalsbeek, controlled “global issues” that were complex-wide, which included the water heaters. For example, the POA instructed FRPM to conduct carbon monoxide testing inside of the units every three months. To that end, the POA issued two sets of procedures governing carbon monoxide testing. Those procedures also governed the installation of hard-wired carbon monoxide alarms. And, in September 2011, the POA enlisted an engineering firm in an effort to explore solutions short of replacing the water heaters. According to the engineering firm, the various solutions were to (1) increase “fresh air intakes”; (2) replace existing water heaters; and (3) replace “the smoke detectors with CO/Smoke detector combination sensor[s.]”
In November 2011, FRPM relayed the engineering firm’s findings to unit owners. Matthew Switzer, who owns the building in which unit 4624 sits, responded that he was unaware of any carbon monoxide issues with his units. FRPM clarified that Switzer’s units had “checked in good during the, CO detecting.” FRPM further indicated that it would *322 contact Switzer if later testing revealed carbon monoxide concerns with his units.
Under the POA’s directive, FRPM conducted carbon monoxide testing on March 9, 2012. That testing revealed a high level of carbon monoxide in several units, including unit 4624. However, that testing was later contradicted. When Intermountain Gas tested unit 4624 on March 12, 2012, it reported normal, non-hazardous levels of carbon monoxide. In any event, although FRPM had stated it would contact Switzer if testing-revealed carbon monoxide concerns with his units, Switzer was never contacted about the high levels discovered on March 9, 2012.
Warnings were distributed to tenants following the high levels of carbon monoxide discovered on March 9, 2012. The warning, placed on unit 4624⅛ front door, informed tenant Adra Kipper that her unit’s water heater was emitting “higher levels of carbon monoxide than we would like to see.” The warning further informed Kipper that her water heater would be “replaced next week.” A battery-powered carbon monoxide alarm was provided along with the warning because, although FRPM had begun to install hard-wired alarms under the POA’s directive, a hard-wired alarm had not yet been installed in unit 4624.
Kipper’s water heater was never replaced. And, although Kipper used the battery-powered carbon monoxide alarm initially, she eventually removed the alarm’s batteries and placed it in a closet after it started beeping, apparently due to low batteries. Consequently, when Kipper had two overnight guests— Forbush and Halowell—staying over on November 10, 2012, no alarm sounded when the vent on Kipper’s water heater clogged and caused the emission of hazardous levels of carbon monoxide. The incident killed For-bush and injured Halowell.
Appellants filed their initial complaint on March 7, 2013, and eventually filed four amended complaints. They named several parties as defendants, including the POA and Kalsbeek, Respondents in this appeal. The district court granted summary judgment to Respondents. Appellants bring this timely appeal.
II. ISSUES ON APPEAL
1. Did the district court properly grant summary judgment to the POA?
2. Did the district court properly grant summary judgment to Kalsbeek?
3. Should we award attorney fees on appeal?
III. STANDARD OP REVIEW
This Court reviews a summary judgment order under the same standard the district court used in ruling on the motion. Kolln v. Saint Luke’s Reg’l Med. Ctr., 130 Idaho 323, 327, 940 P.2d 1142, 1146 (1997). That is, summary judgment is appropriate if “the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” I.R.C.P. 66(c). We construe disputed facts in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. Major v. Sec. Equip. Corp., 155 Idaho 199, 202, 307 P.3d 1225, 1228 (2013).
Mitchell v. State, 160 Idaho 81, 84, 369 P.3d 299, 302 (2016).
 The main issues in this appeal trigger negligence, which consists of four elements: “(1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant’s conduct and the resulting injuries; and (4) actual loss or damage.” Grabicki v. City of Lewiston, 154 Idaho 686, 691, 302 P.3d 26, 31 (2013) (citation omitted). More specifically, this appeal centers on whether a duty existed, which is generally a question of law over which this Court has free review. See Gagnon v. W. Bldg. Maint., Inc., 155 Idaho 112, 115, 306 P.3d 197, 200 (2013). However, whether a duty existed becomes a question of fact if it requires resolution of disputed facts. See Coghlan v. Beta Theta Pi Fraternity, 133 Idaho 388, 402, 987 P.2d 300, 314 (1999).
*323 IV. ANALYSIS
The three main issues raised on appeal are whether (A) summary judgment was properly granted to the POA; (B) summary judgment was properly granted to Kalsbeek; and (C) Respondents are entitled to attorney fees on appeal. We discuss each below.
A. Did the district court properly grant summary judgment to the POA?
Appellants contend the district court erred by granting summary judgment to the POA because triable issues of fact surround whether the POA (1) owed a premises liability-based duty of care; (2) owed a duty of care it acquired as a result of voluntary undertakings; and (3) is vicariously liable for FRPM’s conduct.
1. Premises liability
Appellants first argue the POA owed a premises liability-based duty of care to For-bush and Halowell. As a threshold matter, we note that the POA neither owned nor occupied unit 4624. Instead, Switzer owns unit 4624, and tenant Adra Kipper occupied unit 4624. We must therefore decide whether a premises liability-based duty of care can be imposed on a party who neither owns nor occupies the property at issue.
Appellants correctly inform us that “the general rule of premises liability is that one having control of the premises may be liable for failure to keep the premises in repair.” Jones v. Starnes, 150 Idaho 257, 261, 245 P.3d 1009, 1013 (2011) (quoting Heath v. Honker’s Mini-Mart, Inc., 134 Idaho 711, 713, 8 P.3d 1254, 1256 (Ct. App. 2000)). Appellants maintain that the POA had control over unit interiors under the OCRs and, regardless of the OCRs, actually exerted control over unit interiors. Consequently, Appellants assert it is irrelevant that the POA neither owned nor occupied unit 4624.
Appellants’ position overlooks how our premises liability cases are limited to actions involving owners or occupiers of land and their agents. E.g., Rountree v. Boise Baseball, LLC, 154 Idaho 167, 171, 296 P.3d 373, 377 (2013) (“The duty owed by owners and possessors of land depends on the status of the person injured on the land....” (emphasis added)); Stem v. Prouty, 152 Idaho 590, 591-92, 272 P.3d 562, 563-64 (2012) (analyzing premises liability claim against owner of property); Harrison v. Taylor, 115 Idaho 588, 595, 768 P.2d 1321, 1328 (1989) (“Henceforward, owners and occupiers of land will be under a duty of ordinary care under the circumstances towards invitees who come upon their premises.”). Thus, we reject Appellants’ premises liability argument and reaffirm our case law holding that a premises liability-based duty of care may be imposed only on owners or occupiers of land and their agents.
The dissent, however, maintains that status as an owner or occupier is irrelevant. The dissent’s analysis wholly forgets that premises liability furnishes a fundamental tripartite framework, under which land entrants are defined as an invitee, a licensee, or a trespasser. E.g., Stiles v. Amundson, 160 Idaho 530, 532 n.3, 376 P.3d 734, 736 n.3 (2016). The dissent’s analysis renders the well-established tripartite framework inapplicable. A stranger who neither owns nor occupies the land at issue could not request an invitee to visit the land so as to confer a benefit on the land to the stranger, given that the stranger has no right to the land in the first place. Similarly, a stranger is without authority to authorize a licensee to enter land to which the stranger has no right. Finally, it cannot be said that a trespass occurs when a person enters land to which the stranger has no right simply because the stranger did not authorize that person’s visit. Nevertheless, the dissent’s analysis would permit these scenarios to be litigated under the rubric of “premises liability.”
In the dissent’s view, control is the essential test. While the dissent creates several hypothetical scenarios that are irrelevant to this ease in an attempt to show that some degree of control, by itself, should be sufficient to trigger premises liability, this Court has never resolved a premises liability case in such a manner. Three of our cases firmly reinforce that premises liability does not extend beyond owners or occupiers of the premises and their agents, and that control determines which party, as between the own *324 er or occupier and their agents, had control of the premises during the relevant time. First, in Otts v. Brough, 90 Idaho 124, 131, 409 P.2d 95, 98 (1965), superseded on other grounds by I.C. § 6-801, we explained:
Owners or persons in charge of property owe to an invitee or business visitor the duty to keep the premises in a reasonably safe condition, or to warn the invitee of hidden or concealed dangers of which the owner or one in charge knows or should know by exercise of reasonable care, in order that the invitee be not unnecessarily or unreasonably exposed to danger.
Otts concerned the duty owed by a general contractor to a subcontractor. Id. at 131-32, 409 P.2d at 98-99. The general contractor occupied the worksite at issue, as he “stated that he was continually on the job site; that every day he supervised the entire work of the construction of the building[.]” Id. at 132, 409 P.2d at 99, We reversed summary judgment that had been granted to the general contractor, concluding triable issues of fact surrounded tire general contractor’s liability. Id. at 135-36, 409 P.2d at 101-02. Otts, therefore, forecloses the dissent’s assertion that our ruling today would allow “a general contractor or construction manager, who exercises the requisite control over the premises, [to] escapfe] liability ... because he does not neatly lit within the categories elucidated today.” As demonstrated in Otts, a general contractor or construction manager is regularly in occupation of the premises at issue. Additionally, the general contractor or construction manager is frequently an agent of the owner or occupier. But even supposing premises liability were for some reason inapplicable, the dissent embellishes the notion of a tortious general contractor or construction manager “escaping liability.” Premises liability is not the exclusive path to liability.
Similarly, in Jones, as the dissent acknowledges, this Court stated that “the general rule of premises liability is that one having control of the premises may be liable for failure to keep the premises in repair.” 150 Idaho at 261, 245 P.3d at 1013 (quoting Heath v. Honker’s Mini-Mart, Inc., 134 Idaho 711, 713, 8 P.3d 1254, 1256 (Ct. App. 2000)). Our clear holding in Jones, however, was that the district court properly found premises liability did not apply because the injury occurred “on a public sidewalk or street, and not on [the defendant’s] property.” Id.; see also Heath, 134 Idaho at 714, 8 P.3d at 1257 (affirming summary judgment for defendant because plaintiffs vague assertion that she “may well have been” on property the defendant owned did not raise a triable issue of fact). Jones illustrates that, if premises liability indeed applies, the issue becomes which party, as between an owner or occupier of the land and their agents, had control over the premises. We did not hold, nor even suggest, in Jones that a stranger who neither owns nor occupies the property can be sued in premises liability merely by exercising some degree of wrongful or rightful control over the property.
We reaffirmed these principles in our recent case of Stiles v. Amundson, 160 Idaho 530, 531, 376 P.3d 734, 735 (2016), which concerned a “premises liability action brought against ... the owner of a piece of property[.]” In Stiles, the issue raised was “who, between a landlord and a tenant, owes the relevant duty of care to a tenant’s social guests.” Id. at 533, 376 P.3d at 737. In resolving that issue, we explained that “[e]xisting case law demonstrates it is the entity having control over the property that bears the burden of warning social guests and licensees of dangerous conditions on the property.” Id. In affirming summary judgment for the property owner, we reasoned that:
[T]enants are liable to injured third parties, including the tenant’s social guests, as if they were the owner of the property. This stands to reason, because the tenant, as the possessor of the property, is in the best position to eliminate dangers or to make those dangers known to third parties. Landlords, on the other hand, are not in a comparable position because they do not have possessory control over the land. Likewise, they do not have control over the guests hosted by the tenants, and they likely will not even be aware when a tenant’s social guest is on the premises.
Further, landlords, who do not generally have unfettered access to the premises, cannot reasonably be expected to be aware *325 of all potential hazards on the property-while the tenancy is in effect, especially in the event that the tenant creates the hazard. It would create an unfair burden on landlords to give them a responsibility to warn social guests to whom they have no connection of dangers of which they have no way of learning.
Id. at 533-34, 376 P.3d at 737-38. Very similar to Jones, Stiles reinforces that, if premises liability applies, the issue becomes which party, as between an owner or occupier of the premises and their agents, had control over the premises during the relevant time.
Nevertheless, the dissent “cannot square the ... decision today with the Court’s recent decision in McDevitt v. Sportsman’s Warehouse, Inc., 151 Idaho 280, 255 P.3d 1166 (2011).” McDevitt involved a plaintiff who sued a tenant for injuries sustained on a sidewalk outside the tenant’s retail store. Id. at 281, 255 P.3d at 1167. Specifically, the plaintiff tripped over a recessed sprinkler box on the sidewalk. Id. The landlord had hired Idaho Scapes, Inc. to install the sprinkler box. Id. at 282, 255 P.3d at 1168. At some point after Idaho Scapes installed the sprinkler box, it sunk about an inch below the sidewalk, and the plaintiff tripped on it. Id. When the case came before us on appeal, we affirmed that summary judgment was properly granted to the tenant because it owed no duty of care to keep the sidewalk, which was not part of the leased premises, reasonably safe or to warn of hazards. Id. at 281, 255 P.3d at 1167. As the dissent correctly observes, we first analyzed whether the tenant occupied the sidewalk, ultimately concluding the sidewalk “was not part of the leased premises.” Id. at 285, 255 P.3d at 1171. We then addressed arguments concerning whether the tenant controlled the sidewalk outside its retail store. Id. Regarding that inquiry, we emphasized that “[n]o Idaho case has confronted a fact pattern such as the one at issue here, where the area over which the tenant allegedly has control is not a part of the leased premises.” Id. In looking to other jurisdictions, we explained that, “absent a contractual obligation, a tenant in a multi-tenant shopping mall does not have control over common areas, and therefore has no duty to keep them safe for invitees.” Id. (listing cases). We then concluded the tenant owed no duty of care to keep the sidewalk outside its retail store reasonably safe or to warn of hazards because the commercial lease and OCRs “imposed the duty to maintain the common areas on the landlord....” Id. at 286, 255 P.3d at 1172. Accordingly, McDevitt did not expand the confines of premises liability. Rather, we declined to hold that a tenant who neither owns nor occupies the area at issue can somehow exert the requisite control to trigger premises liability, Thus, McDevitt aligns with our analysis today. In fact, it is the dissent’s analysis that McDevitt does not support. The dissent’s analysis would suggest that Idaho Scapes, the entity that merely installed the sprinkler box, could be held liable in premises liability. That issue was never presented to us in McDevitt, and we never suggested that an entity like Idaho Scapes could be sued in premises liability. But once again, the dissent overlooks that, even if premises liability is for some reason inapplicable, it does not represent the exclusive path to liability in tort law.
The above holdings illustrate that premises liability concerns the duties owed by owners and occupiers of land and their agents. Secondary sources are in accord. See, e.g., 2 Premises Liability 3d § 36:1 (2016) (“Premises liability stems from the law of negligence and constitutes the body of law that sets the guidelines involving duties owed by an owner or occupier of real estate,...” (emphasis added)); Restatement (Third) of Torts: Phys. & Emot. Harm § 51 (2012) (summarizing the duties that possessors of land owe). Thus, contrary to the dissent’s assertion, our ruling in this regard is aptly supported by current law. Premises liability does not contemplate imposing a duty of care on a stranger who neither owns nor occupies the premises at issue merely because the stranger may have exercised some degree of wrongful or rightful control over the premises. Indeed, like we explained in Stiles, ascribing a premises liability-based duty to a party who is without “unfettered access” to the premises would create an unfair burden, as that party “cannot reasonably be expected to be aware of all potential haz *326 ards[.]”160 Idaho at 533-34, 376 P.3d at 737-38.
Declining to deviate from the above principles, we hold that a premises liability-based duty of care cannot be imposed on the POA since it neither owned nor occupied unit 4624.
2. Voluntary undertakings
The parties dispute (a) whether this argument is preserved; and (b) if so, whether it creates triable issues of fact.
(a) Is the voluntary undertakings argument preserved?
The POA argues Appellants did not preserve their voluntary undertakings argument for appeal because, although Appellants made voluntary undertakings arguments below, those arguments differ from what Appellants now assert on appeal. According to the POA, below Appellants argued tenant Adra Kipper relied on the POA’s alleged voluntary undertakings, but on appeal, Appellants argue FRPM—not Kipper—relied.
The POA’s preservation argument is unavailing. Appellants made broad reliance arguments before the district court, stating that “[b]ecause the POA exerted absolute control over the property manager’s operation and management at the property, First Rate did not even seek owner input on issues ... the POA made the call.” As a result, the district court reasoned that Appellants’ arguments triggered the inquiry of whether the POA “undertook a duty and that Kipper, or even some other party, relied on [the] POA....” That inquiry led the district court to conclude “no party presented any evidence that [the] POA represented to anyone, including First Rate, Switzer, or Kipper, that it, and not the owners, would provide and install carbon monoxide detectors or new water heaters.” The district court further explained that FRPM did not rely on the POA’s voluntary undertakings, if any, because FRPM understood that unit owners had exclusive control over unit interiors. Given that adverse ruling, Appellants’ voluntary undertakings argument is preserved for this appeal.
(b) Did the POA owe a duty of care as a result of voluntary undertakings?
This Court has recognized that if “one voluntarily undertakes to perform an act, having no prior duty to do so, the duty arises to perform the act in a non-negligent manner.” Coghlan v. Beta Theta Pi Fraternity, 133 Idaho 388, 400, 987 P.2d 300, 312 (1999). That duty, however, “is limited to the duty actually assumed.” Beers v. Corp. of Pres. of Church of Jesus Christ of Latter-Day Saints, 155 Idaho 680, 688, 316 P.3d 92, 100 (2013) (citation omitted). “[M]erely because a party acts once does not mean that party is forever duty-bound to act in a similar fashion.” Id. This duty arises “when [i] one previously has undertaken to perform a primarily safety-related service; [ii] others are relying on the continued performance of the service; and [iii] it is reasonably foreseeable that legally-recognized harm could result from failure to perform the undertaking.” [1] Id. (citation omitted). We discuss each element below.
i. Specific undertakings
Appellants contend the POA specifically undertook to control (1) the installation of hard-wired carbon monoxide alarms; (2) preventative maintenance; and (3) carbon monoxide warnings.
1. Hard-wired carbon monoxide alarms
Appellants argue triable issues of fact surround whether the POA voluntarily undertook to control the installation of hardwired carbon monoxide alarms. That argument centers on how the POA, through Kalsbeek, issued two sets of procedures governing the installation of hard-wired carbon monoxide alarms.
*327 The POA issued its first set of procedures in March 2012 after learning of carbon monoxide concerns. Under the POA’s procedures, hard-wired carbon monoxide alarms were to be installed during “turnovers, preventative maintenance, lease renewals, or faulty smoke detectors,,.. ” Thus, the procedures contemplated piecemeal installation. The procedures were amended after a tenant’s carbon monoxide alarm sounded in October 2012. The tenant called the fire department, which tested the unit and found the water heater was emitting high levels of carbon monoxide. After that incident, FRPM contacted the POA to request immediate installation of hard-wired carbon monoxide alarms, seeking authorization for a maintenance man to visit “every unit and check and make sure the CO detectors that we installed are in working condition. The units that do not have CO detectors I would like him to install one.” Kalsbeek responded on behalf of the POA, stating that he would talk “to the board and see how the board wants to proceed.” FRPM’s request for immediate installation was further discussed at the POA’s annual meeting in October 2012, where it became clear that many units lacked hardwired carbon monoxide alarms. After that meeting, the POA, through Kalsbeek, amended the procedures, stating that hard-wired carbon monoxide alarms were to be installed “continuously.”
The POA argues it acted as nothing more than a “sounding board” for issues affecting multiple owners and, thus, did not exercise control over the installation of hard-wired carbon monoxide alarms. As an issue concerning unit interiors, the POA maintains that unit owners had exclusive control over the installation of hard-wired carbon monoxide alarms. On the one hand, in November 2011, FRPM sent an email to unit owners concerning hard-wired carbon monoxide alarms, seeking unit owners’ approval for installation. Yet, eleven months later, Kals-beek indicated that the POA’s procedures governed, stating that “[t]here is absolutely nothing about owners’ ... approval” with respect to the installation of hard-wired carbon monoxide alarms. The POA asserts that Kalsbeek merely meant that FRPM did not need unit owners’ approval because FRPM already had authority to make repairs costing less than $250 under FRPM’s maintenance contracts with unit owners, and hardwired carbon monoxide alarms cost less than $250. While the record provides only indirect support for that assertion, its veracity is irrelevant. Even if that assertion is true, a jury could still reasonably find that the POA, through Kalsbeek, undertook to control the installation of hard-wired carbon monoxide alarms by issuing the two sets of procedures.
The district court concluded issuing the two sets of procedures was not an undertaking that would “create a duty to repair or replace the water heaters or to install carbon monoxide detectors inside the units.” While the district court is correct that this undertaking would not create a “duty to repair or replace the water heaters or to install carbon monoxide detectors inside the units,” that conclusion overlooks whether this undertaking would create a duty to nevertheless control the installation of hard-wired carbon monoxide alarms. We find triable issues of fact surround that issue.
2. Preventative maintenance
The second voluntary undertaking Appellants cite concerns preventative maintenance and arises from a string of emails sent on April 15, 2011. That day, FRPM reported to the POA that certain maintenance needed to be performed, explaining that:
Intermountain [G]as came out today and inspected an empty unit to try to find out what is causing the gas smell from the water heaters. He said the problem is with the venting. There are two different kinds of water heaters here, some have a metal screen around the bottom of the tank, the others don’t have the screen that goes around, but one in the middle on the bottom. Those get clogged with lint, hair, debris very easily and if there is not adequate air flow from the bottom then the water heater cannot release exhaust. He said we just need to elean/vacuum off the screens and it will be fine. I- think we should add this to the turn over spreadsheet under Typical Items for [the maintenance man] to vacuum out the bottom area and screens. Let me know if this is ok....
*328 Before the POA responded, another email from FRPM clarified that a professional plumber should be hired, explaining:
No. Please do not have [the maintenance man] vacuum these. This is something the plumber needs to do. I already asked them when I went and had my “plumbing training” at their shop. In order to clean it properly some things have to be taken apart so it can get cleaned from both sides or it would be pointless and/or could cause more problems. I will be in Meridian shortly and will explain, This will be a common problem since the units are located next to the dryers.
Later that day, the POA, through Kals-beek, communicated disagreement with FRPM’s idea that a plumber should be hired, citing cost concerns:
This seems to be a very expensive solution to have a plumber come out and vacuum vents for water heaters. Why not have [the maintenance man] learn what needs to be done to do it correctly at a lower cost? Are these only going to be done at turnovers? The vents need to be cleaned at least annually for preventative maintenance to be effective, is this something that if regularly vacuumed will not require a labor intensive process? These could be done at the same time as the filter changes maybe?
Three days later, FRPM sent the POA information on the cost to hire a plumber and requested guidance as to what next steps should be taken. The POA, through Kals-beek, responded that “[l]et us review this and get back to you next week.” The POA never responded, and the maintenance was never performed. As a result, Appellants contend the POA undertook to control the above preventative maintenance and is to blame for the fact that it was not performed.
We note that the district court never addressed this undertaking, although it was raised below. On appeal, the POA argues Kalsbeek’s “alleged non-response is not an affirmative act creating an assumption of duty to install detectors. Indeed, it was FRPM who was contractually obligated to have preventative maintenance performed on #4624 bi-annually at the expense of the owner....” Although that argument boasts logical appeal, the undisputed facts do not support it. Instead, the above demonstrates that a jury could reasonably find that the POA voluntarily undertook to control preventative maintenance, regardless of any contractual obligations between FRPM and unit owners.
3. Carbon monoxide warnings
The third voluntary undertaking Appellants cite concerns carbon monoxide warnings. Appellants point to two warnings.[2] First, in July 2011, FRPM wanted to distribute a warning it had received from a professional plumber, Ben Davis, who inspected the water heaters after carbon monoxide concerns emerged. Davis’s letter detailed the scope of the carbon monoxide threat and advised that “these issues be solved before any tenants suffer health problems or death.” The POA, through Kalsbeek, intervened and instructed FRPM to not distribute Davis’s letter. Sheila Thomason, FRPM’s maintenance supervisor, testified that Kalsbeek’s instruction was the sole reason why Davis’s letter was not distributed. As Thomason testified, Kalsbeek wanted to be “in charge of distributing this type of information to the individual—individual owners at Sagecrest.”
Second, in March 2012, FRPM contacted Kalsbeek concerning warnings to distribute to unit owners and tenants and provided a draft warning. The warning “stated different levels of CO levels and what the ... symptoms were experienced at those levels.” Kals-beek reviewed the warning and instructed FRPM to not distribute the warning, insisting it was irrelevant. FRPM, however, clarified that the warning had already been distributed.
The district court found that “no one presented any evidence that [the] POA undertook the duty to warn tenants about carbon monoxide issues....” The POA similarly ar *329 gues the above facts do not concern “acts to warn the tenants of the dangerous condition on the property previously...." Neither the district court’s finding nor the POA’s argument persuades us. To be deal’, the district court and the POA are correct insofar that the above facts do not show that the POA undertook to warn unit owners and tenants; rather, the above facts illustrate that FRPM undertook to warn unit owners and tenants. But that condusion overlooks whether the POA undertook to exercise control over warnings by intervening, or attempting to intervene, with regal’d to the two warnings above. Exercising control over warnings is a different issue than actually distributing warnings, and we find triable issues of fact suiTound its resolution.
ii. Reliance
According to Appellants, FRPM relied on the POA with regard to the three voluntary undertakings explored above. The district court, by contrast, concluded no party relied on the POA and explained that:
Other than argument, no party presented any evidence that Sagecrest POA represented to anyone, including First Rate, Switzer or Kipper, that it, and not the owners, would provide and install carbon monoxide detectors or new water heaters. In fact, the only evidence is that Kipper did not even know who or what Sagecrest POA was. The only evidence in the record is that both Sagecrest POA and First Rate always recognized that First Rate needed Switzer’s consent, as the owner of the unit, to repair or replace the water heaters if the cost was over $250.
The record before us on appeal causes us to disagree. First, as to the installation of hard-wired carbon monoxide alarms, the POA issued two sets of procedures governing that undertaking. The POA’s procedures appear mandatory, as they instruct that the “procedures shall be followed....” FRPM referred to the POA’s procedures as “Jon’s procedures or Jon’s way.” Specifically, “[h]e came into town ... and said, ‘[t]his is what the procedures are going to be.’ He laid them out for [FRPM].” And, the POA refused to deviate from those procedures. For instance, although FRPM requested to make immediate installation of hard-wired carbon monoxide alarms in October 2012, the request was never granted. Indeed, Lizz Loop, FRPM’s general manager, explained that immediate installation was not performed because FRPM was “following the procedures.” Thus, triable issues of fact surround whether FRPM relied on the POA with respect to this voluntary undertaking.
Triable issues of fact also surround whether FRPM relied on the POA with respect to preventative maintenance. As discussed, FRPM proposed hiring a plumber to perform preventative maintenance, provided informar tion on the cost to do so, and requested guidance. The POA, through Kalsbeek, objected to FRPM’s proposal, citing cost concerns, but indicated the POA would nevertheless review that information and “get back ... next week.” But the POA never did so, and the preventative maintenance was never performed. Given that the POA represented it would provide guidance, a jury could reasonably find that FRPM relied on the POA regarding this voluntary undertaking.
Finally, triable issues of fact surround whether FRPM relied on the POA with respect to the distribution of Ben Davis’s letter. As noted, FRPM sought to distribute Davis’s letter in July 2011. Because Kals-beek’s instruction prohibited FRPM from doing so, as Thomason testified, a jury could reasonably find that FRPM relied on the POA with respect to the distribution of Davis’s letter. Conversely, reliance cannot be shown as a matter of law regarding the warning issued in March 2012. The key undisputed fact undermining reliance is that the March 2012 warning was issued before the POA, through Kalsbeek, could intervene. While Kalsbeek instructed that the warning should not be issued, his instruction came too late. In sum, although relianee fails as a matter of law regarding the March 2012 warning, triable issues of fact surround whether FRPM relied on the POA with respect to Davis’s letter.
The POA tries to rebut the above by arguing FRPM .could not rely on the POA with respect to undertakings FRPM had contracted to perform on behalf of unit owners. The *330 undisputed facts do not support that argument. Based on the above, the record is replete with factual disputes showing that a jury could reasonably find that PRPM relied on the POA. In fact, this case is similar to Baccus v. Ameripride Services, Inc., 145 Idaho 346, 179 P.3d 309 (2008). In Baccus, an employer hired a contractor to place safety mats at workplace entryways. Id. at 351-52, 179 P.3d at 314-15. On at least one occasion, the contractor failed to do so, and as a result, an employee slipped and became injured. Id. The employee sued the contractor in negligence. Id. When the ease came before us on appeal, we explained with regard to reliance: “[s]o, [the contractor] induced [the employer’s] reliance on [the contractor’s] promise to replace the safety mats, which increased the risk that ... [an] employee such as plaintiff could slip, fall, and sustain injury were the promise not kept.” Id. at 352, 179 P.3d at 315. Here, like Baccus, a jury could reasonably find that the POA induced FRPM’s reliance with regard to hard-wired carbon monoxide alarms, preventative maintenance, and carbon monoxide warnings, all of which were matters with the potential to increase the risk of harm to Sagecrest tenants and guests. Therefore, we conclude triable issues of fact surround reliance.
iii. Foreseeability
“[N]ormally, the foreseeability of a risk of harm, and thus whether a duty consequently attaches, is a question of fact reserved for the jury.” Stoddart v. Pocatello Sch. Dist. #25, 149 Idaho 679, 686, 239 P.3d 784, 791 (2010). We find that to be true in this case. We cannot say as a matter of law that Forbush’s death and Halowell’s injuries were or were not foreseeable. Instead, we find it proper for a jury to decide.
In sum, triable issues of fact surround whether the POA acquired a duty of care as a result of the voluntary undertakings explored above. We therefore reverse the district court’s grant of summary judgment in this regai'd and remand for further proceedings consistent with this opinion. We emphasize that if the POA is found to have acquired a duty of care as a result of these voluntary undertakings, any duty imposed must be limited to the scope of the actual undertaking. Cf. Beers v. Corp. of Pres. of Church of Jesus Christ of Latter-Day Saints, 155 Idaho 680, 688, 316 P.3d 92, 100 (2013) (“[Although a party may assume a duty by undertaking to act, that duty is limited to the scope of the undertaking.”).
3. Vicarious liability
Finally, Appellants argue triable issues of fact surround whether the POA is vicariously liable for the torts of its agent, FRPM. “A principal is liable for the torts of an agent committed within the scope of the agency relationship.” Sharp v. W.H. Moore, Inc., 118 Idaho 297, 303, 796 P.2d 506, 512 (1990). An agency relationship arises when the principal:
(1) [E]xpressly grants the agent authority to conduct certain actions on his or her behalf; (2) impliedly grants the agent authority to conduct certain actions which are necessary to complete those actions that were expressly authorized; or (3) apparently grants the agent authority to act through conduct towards a third party indicating that express or implied authority has been granted.
Humphries v. Becker, 159 Idaho 728, 735, 366 P.3d 1088, 1095 (2016). “This Court has previously viewed the question of whether an agency relationship exists as a question of fact for the jury to determine.” Id. at 735 n.2, 366 P.3d at 1095 n.2. But, to be clear, “[w]hether facts sufficient to constitute an agency relationship exist is indeed a question of fact for the jury, however, whether a given set of facts are sufficient to constitute an agency relationship is a question of law appropriate for this Court’s consideration.” Id.
The district court rejected Appellants’ agency argument, concluding Appellants lacked authority over unit interiors. That conclusion rests on the authority granted to the POA under the OCRs, which the district court found was limited to unit exteriors. We agree insofar that the OCRs do not grant the POA any authority over unit interiors, and hence, the OCRs cannot give rise to an agency relationship over unit interiors. Indeed, the OCRs clearly and unambiguously delineate authority between the POA and *331 unit owners. CCR § 3.3 gives the POA authority over unit exteriors and unit owners authority over unit interiors. CCR § 3.5 reinforces that delineation of authority, as it provides that “[e]ach Owner shall have the exclusive right to paint, repair, tile, wash, paper or otherwise maintain ... the interior portions of their Four Plex....” Because the OCRs do not give the POA any authority over unit interiors, they cannot give rise to an agency relationship over unit interiors.[3]
However, the district court overlooked how authority bestowed by a contract, like the OCRs, is not dispositive when determining whether an agency relationship exists. E.g., Thornton v. Ford Motor Co., 297 P.3d 413, 419 (Okla. Civ. App. 2012) (“If the facts show actual control by the principal, an agency is established regardless of the contract language.”); Hylton v. Koontz, 138 N.C.App. 629, 532 S.E.2d 252, 257 (2000) (“It is not dispositive that a contract denies the existence of an agency relationship, if in fact the relationship was that of agent-principal.”); Tomlinson v. G.E. Capital Dealer Distrib. Fin., Inc., 624 So.2d 565, 567 (Ala. 1993) (“[T]he language of this provision is not conclusive and will not preclude the finding of agency if there is independent evidence of a retained right of control.”). We have long instructed that the “important factor is the control or right of control reserved by the [principal] over the functions and duties of the agent.” Koch v. Elkins, 71 Idaho 50, 57, 225 P.2d 457, 462 (1950).
In this case, we find triable issues of fact surround whether an agency relationship existed as a result of control the POA aetually exerted over FRPM with regard to unit interiors. As a general matter, the record shows that the POA exercised financial leverage over FRPM. As Appellants assert, Sage-crest was FRPM’s largest account, and FRPM was therefore required to stay in the POA’s “good graces” to keep Sagecrest. CCR § 6.6A supports that assertion, as it required unit owners to employ the same property management company the POA selected to employ for its duties. Further, the POA controlled FRPM’s rate of compensation. FRPM’s compensation at Sagecrest was twofold: (1) a $150 monthly management fee, paid by the POA; and (2) five percent of monthly gross rental receipts, which, although paid by unit owners, was contingent on the rental rates that the POA and FRPM set. Finally, the POA paid the wages of FRPM’s employees who were “fully assigned” to Sagecrest. The POA therefore oversaw those employees’ overtime requests. For example, in October 2012, the POA requested FRPM to clarify in which units hardwired carbon monoxide alarms were installed. In response, FRPM’s employee requested to stay late, working overtime, to gather the information. The POA denied the overtime request.
The POA maintains that the above arguments are “completely irrelevant to the issues of control of the interiors of the units.” The POA elaborates that “Switzer had a contract with FRPM to manage his unit #4624. Switzer granted authority to FRPM over his residential lot and, as a non-party to the contract, the SMPOA Board could not alter this agreement in any way.” We decline *332 to find Switzer’s contract with FRPM dispos-itive. Despite that contract, we find triable issues of fact surround whether the above leverage allowed the POA to exert control over FRPM and unit interiors. Tony Drost, FRPM’s President, testified that the POA, through Kalsbeek, controlled “global issues” that were complex-wide. Drost testified that global issues extended to unit interiors and consisted of “the CO testing”; “the water heaters”; “leaks with the windows, stairwells, light bulbs.” According to Drost, FRPM was required to “run any global issue through [Kalsbeek]....” Sheila Thomason, FRPM’s Maintenance Supervisor, further testified that Kalsbeek Vas in charge.” She explained that Kalsbeek led FRPM to believe that “he spoke on behalf of the owners.” Thus, Swit-zer’s contract with FRPM does not resolve whether the POA exerted actual control over FRPM and unit interiors.
Moreover, as explained above, triable issues of fact surround whether FRPM relied on the POA regarding (1) the installation of hard-wired carbon monoxide alarms; (2) preventative maintenance; and (3) carbon monoxide warnings. See supra Part IV(A)(2)(b). Based on the record before us on appeal, triable issues of fact surround whether the POA’s control over FRPM caused FRPM to rely on the POA with respect to those voluntary undertakings. Consequently, we cannot say as a matter of law that no agency relationship existed as a result of actual control. We therefore reverse summary judgment on this issue and remand for further proceedings consistent with this opinion.
B. Did the district court properly grant summary judgment to Kalsbeek?
Appellants contend triable issues of fact surround whether Kalsbeek owed a duty of care he acquired as a result of voluntary undertakings.[4] To make this argument, Appellants rely on the same contentions explored above concerning the POA. See supra Part IV(A)(2)(b). Here, however, Appellants’ arguments implicate Kalsbeek as an individual, not as the POA’s President. Thus, Appellants seek to hold Kalsbeek personally liable.
“A director who personally participates in a tort is personally liable to the victim, even though the corporation might also be vicariously liable.” Eliopulos v. Knox, 123 Idaho 400, 404, 848 P.2d 984, 988 (Ct. App. 1992). The same is true for corporate officers. See, e.g., 18B Am. Jur. 2d Corporations § 1609 (2016) (“A director or officer of a corporation does not incur personal liability for its torts ... unless he or she has participated in the wrong, had direct personal involvement ... or authorized or directed that the wrong be done.”). “A contrary rule would enable a director or officer of a corporation to perpetrate flagrant injuries and escape liability behind the shield of his or her representative character even though the corporation might be insolvent or irresponsible.” Id.
In granting summary judgment to Kalsbeek, the district court applied the same logic to Kalsbeek as it applied to the POA and concluded Kalsbeek did not acquire a duty of care as a result of voluntary undertakings. That conclusion represents error. Based on the above, triable issues of fact surround whether the POA acquired a duty of care as a result of voluntary undertakings. And, as noted, Kalsbeek directed those undertakings. Kalsbeek promulgated the POA’s two sets of procedures governing the installation of hard-wired carbon monoxide alarms. FRPM even referred to those procedures as “Jon’s procedures.” Kalsbeek objected to FRPM’s preventative maintenance pi'oposal and instructed FRPM that the POA would provide guidance, but he failed to do so. Kalsbeek intervened in an effort to control the warnings issued to unit owners and tenants, and as FRPM explained, Kalsbeek was the sole reason why Ben Davis’s letter was not distributed.
Kalsbeek concedes his involvement in these matters, but he contends it does not give rise to a duty of care. He emphasizes how OCR § 7.2 designates him as the “the authorized representative of the [POA] to *333 give and receive notices, approvals, and instructions hereunder.” Simply that the OCRs may authorize Kalsbeek’s involvement is irrelevant. Even if his involvement were authorized, that authorization would not resolve whether he acquired a duty of care as a result of voluntary undertakings and could therefore be subject to personal liability if he personally participated in tortious conduct.
Thus, we conclude triable issues of fact surround whether Kalsbeek acquired a duty of care for the same reasons identified above. See supra Part IV(A)(2)(b). We therefore reverse summary judgment granted to Kalsbeek.[5]
C. Should we award attorney fees on appeal?
Appellants do not request fees. Kalsbeek and the POA request fees under Idaho Code section 12-121, Idaho Rule of Civil Procedure 54(e)(1), and Idaho Appellate Rule 41. Fees are properly awarded to the prevailing party “if the action was pursued, defended, or brought frivolously, unreasonably, or without foundation.” Idaho Military Historical Soc’y, Inc. v. Maslen, 156 Idaho 624, 633, 329 P.3d 1072, 1081 (2014) (citation and internal quotation marks omitted).
As to Kalsbeek, he is not the prevailing party on appeal and is therefore not entitled to fees. As to the POA, it prevails on appeal on the premises liability issue, but Appellants prevail on the issues of whether the POA may have acquired a duty of care as a result of voluntary undertakings, and whether the POA may be vicariously liable for FRPM’s conduct. Although the POA is the prevailing party on the premises liability issue, Appellants did not bring or pursue that argument frivolously, unreasonably, or without foundation. Accordingly, we do not award fees on appeal.
V. CONCLUSION
We affirm in part and reverse in part the district court’s summary judgment order. We affirm that summary judgment was properly granted as to whether the POA owed a premises liability-based duty of care. However, summary judgment was improperly granted as to whether the POA and Kalsbeek acquired a duty of care as a result of voluntary undertakings, and whether the POA is vicariously liable for FRPM’s conduct. We therefore remand this case for further proceedings consistent with this opinion. We decline to award attorney fees on appeal. We award Appellants costs against Kalsbeek on appeal because they prevail against him, but not against the POA.
Justices, EISMANN, JONES and HORTON concur.

. Although safety-related undertakings are frequently at issue, we note that any type of voluntary undertaking is sufficient. Beers, 155 Idaho at 688 n.5, 316 P.3d at 100 n.5 ("We do not intend to suggest that assumed duties exist only in the context of safety-related undertakings. To the contrary, the rule is that 'if one voluntarily undertakes to perform an act having no prior duty to do so’ then a duty 'arises to perform the act in a non-negligent manner.' ” (citation omitted)).

. We note that the warning tenant Adra Kipper received in March 2012, which stated that her unit’s water heater was emitting "higher levels of carbon monoxide than we would like to see” and that her water heater would be "replaced next week,” is not one of these warnings. No argument is made on appeal that the POA undertook any involvement with regard to that warning.

. The parties dispute the extent of authority granted to the POA under CCR § 3.8, which provides:
In the event the Owner of any Residential Lot improved with a Four Plex shall fail to maintain any portion of such Owner’s Residential Lot that Owner is responsible to maintain, in a manner reasonable satisfactory to the Board, after approval by vote of at least sixty percent (60%) of the members of the Board present and voting and subject to such Owner’s right to notice and a hearing before the Board, the Association may, through its agents and employees, enter upon the Residential Lot or Four Plex and repair, maintain and restore the Residential Lot, or the Four Plex. The cost of such repair, maintenance and restoration shall be chargeable to the Owner of such Residential Lot or Four Plex and shall constitute a lien on the Residential Lot of such Owner, collectible in the same manner as Limited Assessments under this Declaration.
The parties specifically dispute whether CCR § 3.8 extends to unit interiors and thus whether it gives the POA authority to maintain unit interiors if unit owners fail to do so. We do not address that dispute. What is undisputed is that CCR § 3.8 requires a 60% vote, notice, and hearing before the POA can take any action. And what is further undisputed is that the procedure did not occur in this case. As a result, the authority CCR § 3.8 provides to the POA, whatever its extent, was never triggered.

. In their opening brief, Appellants argued Kals-beek also owed a premises liability-based duty of care. Appellants have withdrawn that argument. Additionally, although Kalsbeek discussed vicarious liability in his brief, Appellants make clear that they seek to hold only the POA vicariously liable. Thus, we are left with only the voluntary undertakings argument.

. Even if he acquired a duty of care, Kalsbeek argues he is immune from liability under Idaho Code section 30-30-623. Yet, since Kalsbeek concedes the district court did not address the issue of immunity, we decline to reach it on appeal. Cf. Boise Tower Assocs., LLC v. Hogland, 147 Idaho 774, 784, 215 P.3d 494, 504 (2009) (remanding case for resolution of issues die district court never reached).