# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50906

SOUTH HILL MEAT LOCKERS
INCORPORATED,

    Plaintiff-Appellant,

v.

IDAHO TRANSPORTATION
DEPARTMENT, an executive department of
the State of Idaho,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Coeur d'Alene, September 2024
Term

Opinion filed: June 30, 2025

Melanie Gagnepain, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho,
Boundary County. Lamont C. Berecz, District Judge.

The judgment of the district court is <u>vacated</u>. The district court's summary
judgment rulings are <u>affirmed in part</u> and <u>reversed in part</u>.

Sperry Law Office, PLLC, Boise for Appellant. Skip Sperry argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Bentley
Stromberg argued.

---

MOELLER, Justice.

## I. NATURE OF THE CASE

This case arises out of an Idaho Transportation Department ("ITD") project intended to improve a section of U.S. Highway 95 in Bonners Ferry. South Hill Meat Lockers Incorporated ("South Hill") alleged that ITD caused damage to its building while excavation and roadway construction were taking place adjacent to its property. South Hill filed suit, claiming that ITD was liable under seven different causes of action.

ITD moved for summary judgment based predominantly on the affirmative defense of "plan or design immunity" set forth in Idaho Code section 6-904(7), which is part of the Idaho Tort Claims Act ("ITCA"). The judge originally assigned to the case, District Judge Barbara

1

Buchanan,[1] struck portions of the affidavits submitted in support of the motion and denied the request for summary judgment. ITD later filed a second motion for partial summary judgment. Judge Buchanan granted ITD's second motion and dismissed four of South Hill's claims. When Judge Buchanan subsequently retired, District Judge Lamont C. Berecz replaced her and both parties soon moved for reconsideration. Judge Berecz granted ITD's motion for reconsideration on its first motion for summary judgment and dismissed South Hill's complaint with prejudice.

On appeal, South Hill assigns three points of error to the district court's rulings. First, South Hill contends that Judge Berecz erred when he reconsidered and granted ITD's first motion for summary judgment. Second, South Hill challenges Judge Buchanan's grant of ITD's second motion for summary judgment. Finally, South Hill argues that Judge Buchanan erred in granting ITD's motion to bifurcate the trial so that it might present its immunity defense before South Hill presented its case-in-chief. For the reasons set forth below, we affirm the district court's orders in part and reverse in part.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Project

In 2019, ITD commenced a road construction project (the "Project") to improve "safety and mobility" on Highway 95 in Bonners Ferry, Idaho. The Project covered a roughly 1.3-mile span between milepost 506.251 and milepost 507.565, from Alderson Lane to the Kootenai River Bridge. The Project included plans to expand the existing two-lane roadway into three lanes, add bicycle lanes, and update the sidewalks to improve disability access.

The Project was initially approved as a general concept by ITD in 2011. ITD then hired HMH Engineering to prepare plans for the Project. In addition to the detailed plans and specifications for the Project, HMH Engineering conducted numerous reports and studies, including traffic studies, an environmental evaluation, stormwater reports, a recorded survey, and materials reports. In January 2018, the final plans were reviewed by multiple ITD engineers, including Justin Wuest, an ITD Resident Engineer, and Ryan Hawkins, an ITD Operations Engineer ("Wuest" and "Hawkins"). After review of the final plans and specifications, Hawkins affixed his signature to the title page of the plans. The Project was then advertised for bid and

---

[1] This Court typically follows the convention of referring to the presiding trial judge as either the "district court," "magistrate court," or "trial court," instead of referring to the judge by name. However, this opinion concerns several rulings made by two different judges at different stages of the same case. Therefore, to avoid confusion, we will depart from our convention and refer to the judges who presided in this case by their names.

2

ultimately awarded to Goodfellow Brothers, LLC ("Goodfellow Brothers") in April 2018. ITD also hired David Evans & Associates, Inc. ("DEA"), to perform inspection and oversight services of the construction to ensure performance in accordance with the approved plans, specifications, and appropriate standards.

## B. South Hill's Building

Along the Project's path lies South Hill, a butcher, meat packing, and meat storage operation owned by Brett Payne ("Payne"). South Hill operates its business in a building located at 6891 Main Street, in Bonners Ferry, Idaho (the "Building" or the "Property"). The Building was originally constructed in 1950, with various fixtures having been updated since.

## C. The Gas Line is Relocated

To complete roadway construction near South Hill's Building, Goodfellow Brothers determined it was necessary to construct a bypass road by widening the shoulder on the eastern side of the highway, which would allow for construction on the west side of the highway. To accomplish this, ITD provided Avista Utilities ("Avista"), the local utility company, with a plan to relocate the natural gas line from the west side of the highway to the east side. The record is unclear whether ITD's original plans contemplated moving the gas line or whether ITD reviewed Avista's plan to move the gas line. Avista then hired KG&T Septic, Inc., to excavate and backfill a trench to move the gas line. Payne would later testify that the excavation to move the natural gas line came within 12 to 18 inches of the face of the Building, and exposed portions of the Building's footing and foundation.

## D. Construction Begins; Damage to South Hill's Building Alleged

Construction on the bypass road began in March 2019. Once the gas line trench was filled, Goodfellow Brothers began construction of the temporary bypass road according to the plans for the Project. The plan specifications called for the use of heavy equipment, including bull dozers, dump trucks, and vibratory soil compactors, all of which caused significant shaking to the ground and the surrounding areas.

Soon after construction started, Payne expressed concerns to Goodfellow Brothers over the proximity of construction to his Building and the intense vibrations caused by the heavy equipment it was using. Payne alleged that the intense vibrations from the highway construction damaged the Building, causing cracks to appear in the foundation. In response to Payne's complaints,

3

Goodfellow Brothers opted to use a static roller to compact the base material and asphalt instead of the vibrating roller that had been contemplated.

On April 30, 2019, Mike Jacobs, Goodfellow Brothers' project manager, informed ITD that he met with Payne regarding Payne's concerns with the project and its proximity to South Hill's Building. According to Jacobs, Payne expressed concerns about new cracks appearing in the foundation, floors, and walls of the Building when the heavy equipment was in use. Based on his own observations, Jacobs stated that there were "already quite a bit of cracks in his slab [floor]" and noted that Payne was concerned about them getting worse. Thereafter, Payne claimed the damage continued to get worse. According to Payne and one of his employees, the drain on the west side of the Building stopped functioning properly—it would get backed up and would not improve after being unclogged. Water that normally flowed towards the drain reportedly began to move away from the drain around this time. Moreover, some of the doors in the Building began having problems. For example, Payne reported that the front door would often stick and became difficult to open; while the freezer door began to swing or shut on its own while workers were using it.

These problems led Payne to believe that the Building was beginning to tilt off plumb. Furthermore, Payne maintained that more cracks had begun to form, and the cracks that had previously been observed on the Building began to lengthen and widen. In the months following his complaints, Payne continued to track any damage he observed in the Building. While representatives from ITD and the contractors visited the Property five times between May and July of 2019, nothing was ever done to repair the Building.

### E.  A Notice of Tort Claim is Filed

Acting on behalf of South Hill, Payne filed a notice of tort claim with the State of Idaho in July 2019. On July 15, ITD replied with a letter to Payne explaining that, under the terms of the contract, Goodfellow Brothers had agreed to indemnify the State from all claims arising from the project; therefore, he should contact Goodfellow Brothers' insurance agent to present his claim. A few days later, Payne received a reply letter from Goodfellow Brothers' agent denying ITD's request for indemnification and alleging that the damages resulted from "failures on the part of the State of Idaho" in relocating the gas line near the Building. In its letter, Goodfellow Brothers also requested a meeting with authorized representatives from the State, Avista, South Hill, and

Goodfellow Brothers to inspect the alleged damage and attempt to come to a fair settlement agreement. The record is unclear as to whether this meeting ever took place.

At some point during this time, Payne retained counsel. His attorney reached out to the State multiple times[2] regarding the claim, but as of June 2020, the State had only communicated that it was "making some progress."

### F. South Hill's Complaint and ITD's Defense of "Plan or Design Immunity"

On March 8, 2021, South Hill filed a complaint against ITD in district court asserting seven causes of action, including: (1) tortious damage to real property; (2) negligence per se; (3) strict liability; (4) nuisance; (5) trespass; (6) a violation of due process under Article I, section 13 of the Idaho Constitution by taking property without due process; and (7) a violation of Article I, section 14 of the Idaho Constitution by taking property for public use without just compensation. South Hill contended that the excavation of the land abutting the Property—necessitated by the relocation of the pipeline to build a bypass road—was performed improperly. For example, the ground was not properly compacted, thereby removing the natural and necessary lateral and subjacent support. South Hill also claimed that during the construction of the temporary bypass road, traffic from the bypass road and the heavy equipment used for its construction, caused significant vibrations. South Hill argued that these vibrations "trespassed" or "intruded" through the improperly excavated area and caused significant subsidence, which resulted in shifting that damaged the Building.

ITD asserted various defenses in its answer, including that it was "immune from liability by virtue of Title 6, Chapter 9, Idaho Code," which provides "plan or design immunity" under Idaho Code section 6-904(7). ITD also maintained that, if any damage occurred due to the construction, it was caused by Avista and Goodfellow Brothers who were third-party independent contractors and not agents of ITD. Thus, ITD argued that it was not liable for any negligent conduct by Goodfellow Brothers or Avista.

### G. ITD's First Motion for Summary Judgment

During the months leading up to trial, both parties engaged in discovery. On December 7, 2021, ITD filed its first motion for summary judgment, claiming that South Hill's tort claims should be dismissed pursuant to the design immunity exception in Idaho Code section 6-904(7). To support its motion for summary judgment, ITD submitted the declaration of Wuest, the

---

[2] The record shows that counsel for South Hill left at least two voicemails and emailed the State at least three times inquiring about progress on the claim.

Resident Engineer for District 1. In response, South Hill filed a motion to strike portions of the Wuest declaration. South Hill argued that much of Wuest's declaration failed to comply with Idaho Rule of Civil Procedure 56(c)(4) because it contained conclusory statements, inadmissible hearsay, and statements not based on personal knowledge. Additionally, South Hill argued that the declaration was not properly authenticated and that Wuest was not qualified as an expert to testify to the matters contained in the declaration.

On March 4, 2022, Judge Buchanan entered a memorandum decision and order denying ITD's first motion for summary judgment. The decision stated that "this [c]ourt finds that genuine disputes of material fact exist, both as to whether the Highway 95 improvement project plans conformed to current design and engineering standards, and as to whether the plans were approved by the appropriate body in advance of construction." The district court also granted South Hill's motion to strike in part, striking paragraphs 10, 11, and 16 of Wuest's declaration on the basis that those paragraphs included conclusory statements and failed to "state the basis of his knowledge."

**H. ITD's Second Motion for Summary Judgment**

On June 22, 2022, ITD filed a second motion for partial summary judgment asking the district court to (1) dismiss South Hill's constitutional, nuisance, strict liability, and trespass claims and (2) find that South Hill's claim for attorney fees was not valid. Following a hearing, the court issued a memorandum decision granting summary judgment on South Hill's constitutional, nuisance, trespass, and strict liability claims. The court declined to address the question of attorney fees. Following this decision, South Hill filed a motion to reconsider the decision regarding its trespass claim. The district court granted the motion and reinstated the trespass claim.

**I. The Trial is Reset**

Although trial was initially set for May 2022, the district court entered an amended scheduling order on April 26, 2022, resetting trial for October 24, 2022, due to a backlog on its criminal docket. The court's order specified that "[d]ispositive motions shall be filed no later than 90 days before trial," and "discovery requests, including supplementation under [Idaho Rule of Civil Procedure] 26(e), must be served and responded to at least 60-days [sic] prior to trial" (which would have been August 25, 2022). However, it was soon discovered that ITD's lead attorney would be unable to litigate this matter to conclusion due to her planned retirement; therefore, the court entered a revised scheduling order that reset trial for January 23, 2023. Although it was

moving the trial date back three months, the court reminded the parties that the pretrial deadlines specified in its April 26 order, based on the earlier October 24 trial date, would remain in effect.

## J. Pretrial Motions; A New Judge Assigned

On November 22 and 23, 2022, 60 days prior to the new January trial date, but well after the supplemental discovery deadline for the prior October trial date had passed, ITD provided its seventh and eighth supplemental discovery responses. ITD District Engineer Damon Allen and ITD Operations Manager Ryan Hawkins were identified as persons with knowledge relevant to this case. The supplemental responses included copies of ITD Policies 4001 and 5001, and a reference to the ITD Roadway Design Manual. In response, South Hill filed a motion in limine, asking the district court to exclude all the documents and witnesses in ITD's seventh and eighth supplemental discovery responses because they were untimely.[3]

On December 2, 2022, ITD filed a motion to bifurcate the trial to allow it to put on evidence regarding the design immunity defense in the first phase of trial, which the district court granted. South Hill filed a motion to have the jury visit the premises to view and experience the effects of the equipment used during construction, which the court also granted. However, the court denied South Hill's motion in limine to exclude the documents and witnesses from ITD's seventh and eighth supplemental discovery responses. While Judge Buchanan considered these disclosures late based on the prior October trial date ("I am not happy about the late disclosure"), she declined to exclude them, finding that exclusion was too extreme of a sanction. Instead, the court ordered ITD to pay for the cost of the court reporter and South Hill's counsel to attend the depositions of Allen and Hawkins.

At this time, Judge Buchanan was preparing to retire immediately after the January trial date. The district court gave South Hill a choice to either (1) proceed with the January trial setting and, if necessary, take the depositions of Allen and Hawkins, or (2) set a new trial date with the judge's successor months later if additional time was needed to address the new evidence. South Hill opted to take the second option, and the district court set a later trial date with the judge's successor. After Judge Berecz took over the case in early 2023, both parties filed motions seeking reconsideration of Judge Buchanan's earlier orders. South Hill filed a motion to reconsider the ruling on its motion in limine and ITD's motion for bifurcation. ITD filed a motion for

---

[3] As noted by Judge Berecz in a later order, it appears that Judge Buchanan treated this as a motion for discovery sanctions, rather than as a motion in limine.

reconsideration of the ruling denying its first motion for summary judgment regarding the applicability of plan or design immunity to all of South Hill's claims. After a hearing on these motions, Judge Berecz granted ITD's motion for reconsideration and awarded summary judgment to ITD on all claims. In granting ITD's motion for reconsideration, Judge Berecz did not reach South Hill's motion for reconsideration, considering it moot in light of its ruling. South Hill timely appealed.

## III.     STANDARDS OF REVIEW

When this Court reviews a district court's decision on summary judgment, we apply the same standard used by the district court. *Moyer v. Doug Lasher Constr., Inc.*, 174 Idaho 967, 973, 560 P.3d 1114, 1120 (2024). "[S]ummary judgment is proper if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (alteration in original) (quoting *Pocatello Hosp., LLC v. Quail Ridge Med. Inv., LLC*, 157 Idaho 732, 737–38, 339 P.3d 1136, 1141–42 (2014)). We liberally construe all disputed facts and resolve reasonable inferences in the record in the light most favorable to the party opposing the motion. *Bradbury v. City of Lewiston*, 172 Idaho 393, 402, 533 P.3d 606, 615 (2023). "A mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Moyer*, 174 Idaho at 973, 560 P.3d at 1120 (quoting *AED, Inc. v. KDC Invs., LLC*, 155 Idaho 159, 163, 307 P.3d 176, 180 (2013)).

"This Court reviews a district court's decision on a motion for reconsideration using the same standard of review the lower court used when deciding the motion." *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 229 494 P.3d 769, 777 (2021) (quoting *Monitor Finance, L.C. v. Wildlife Ridge Estates, LLC*, 164 Idaho 555, 433 P.3d 183 (2019)). Rulings concerning the admissibility of "an affidavit offered in support of or opposition to a motion for summary judgment," are reviewed for an abuse of discretion. *Est. of Ekic v. Geico Indem. Co.*, 163 Idaho 895, 898, 422 P.3d 1101, 1104 (2018). When reviewing for an abuse of discretion, the inquiry requires consideration of "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

# IV. ANALYSIS

We begin our analysis by noting that the Idaho Tort Claims Act, set forth in Idaho Code sections 6-901 to -929, "abrogates the doctrine of sovereign immunity and renders a governmental entity liable for damages arising out of its negligent acts or omissions." *Lawton v. City of Pocatello*, 126 Idaho 454, 458, 886 P.2d 330, 334 (1994). Thus, we have held that the ITCA is construed "to favor liability and to limit exceptions." *Grabicki ex rel. Thompson v. City of Lewiston*, 154 Idaho 686, 692, 302 P.3d 26, 32 (2013). Notwithstanding this departure from historic common law principles, the ITCA still "preserves the traditional rule of immunity in certain specific situations." *Lawton*, 126 Idaho at 458, 886 P.2d at 334. For example, Idaho Code section 6-904 sets forth seven exceptions to governmental liability, including the exception at issue in this case:

> EXCEPTIONS TO GOVERNMENTAL LIABILITY. A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
>
> . . . .
>
> (7) Arises out of *a plan or design for construction or improvement to the highways, roads, streets*, bridges, or other public property where such plan or design is prepared in substantial conformance with engineering or design standards in effect at the time of preparation of the plan or design or approved in advance of the construction by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval.

I.C. § 6-904(7) (emphasis added). Coined "plan" or "design" immunity, this defense is available to a governmental entity when a plaintiff's claim arises out of an allegedly negligent governmental plan or design. To receive immunity for its plan or design, the governmental entity must show the existence of a plan that was either (1) prepared in substantial conformance with existing engineering or design standards, or (2) approved in advance of construction by the legislative or administrative authority. *Lawton*, 126 Idaho at 459, 886 P.2d at 335; *Grabicki*, 154 Idaho at 693, 302 P.3d at 33.

South Hill argues that ITD is precluded from asserting this immunity defense based on ITD's untimely discovery disclosures. Moreover, South Hill challenges the general applicability of design immunity to the causes of action it has raised in this case. Specifically, South Hill suggests that the district court erred in three ways: (1) by reconsidering and granting ITD's first motion for summary judgment; (2) by granting ITD's second motion for summary judgment; and (3) by granting ITD's motion to bifurcate the trial so that it might be able to present its design

9

immunity defense prior to South Hill's case-in-chief. In response, ITD argues that the district court's conclusion that Goodfellow Brothers, Avista, and their subcontractors were independent contractors provides an adequate and independent basis for dismissal of South Hill's claims. We will address each issue in turn.

**A. Although the record supports the district court's conclusion that Goodfellow Brothers, Avista, KG&T, and their subcontractors were independent contractors, this is not dispositive of the case.**

The district court, without any discussion or analysis, summarily concluded that Goodfellow Brothers, Avista, and their subcontractors were not agents or employees of the State—they were independent contractors. Therefore, it was "clear to th[e] [c]ourt that ITD is immune from South Hill's claims under the ITCA." On appeal, ITD maintains that the district court's independent contractor finding provides an adequate and independent basis for dismissal of South Hill's claims. While we agree that the record supports the conclusion that Goodfellow Brothers, Avista, and their subcontractors were independent contractors, we disagree that this conclusion is dispositive of South Hill's claims against the State.

In *Brown v. City of Pocatello*, we stated that "[a]s a general rule, a principal is not liable for the negligence of an *independent contractor* in performing the contracted services." 148 Idaho 802, 811, 229 P.3d 1164, 1173 (2010) (emphasis added) (citing *Jones v. HealthSouth Treasure Valley Hosp.*, 147 Idaho 109, 113, 206 P.3d 473, 477 (2009)). However, we have also stated that a "principal is liable for the torts of an *agent* committed within the scope of the agency relationship." *Forbush v. Sagecrest Multi Fam. Prop. Owners' Ass'n, Inc.*, 162 Idaho 317, 330, 396 P.3d 1199, 1212 (2017) (emphasis added) (quoting *Sharp v. W.H. Moore, Inc.*, 118 Idaho 297, 303, 796 P.2d 506, 512 (1990)).

"As a general rule, independent contractors are not agents." *Melichar v. State Farm Fire & Cas. Co.*, 143 Idaho 716, 722, 152 P.3d 587, 593 (2007).

> An agency relationship arises when the principal: (1) [E]xpressly grants the agent authority to conduct certain actions on his or her behalf; (2) impliedly grants the agent authority to conduct certain actions which are necessary to complete those actions that were expressly authorized; or (3) apparently grants the agent authority to act through conduct towards a third party indicating that express or implied authority has been granted.

*Forbush*, 162 Idaho at 330, 396 P.3d at 1212 (alteration in original) (quoting *Humphries v. Becker*, 159 Idaho 728, 735, 366 P.3d 1088, 1095 (2016)). Thus, an agency relationship may be express, implied, or apparent. *See Nelson v. Kaufman*, 166 Idaho 270, 275 n.3, 458 P.3d 139, 144 n.3

10

(2020). "The burden of proving a principal-agent relationship falls upon the party asserting agency." *Melichar*, 143 Idaho at 723, 152 P.3d at 594 (citing *Transamerica Leasing Corp. v. Van's Realty Co.*, 91 Idaho 510, 517, 427 P.2d 284, 291 (1967)). "[W]hether a given set of facts are sufficient to constitute an agency relationship is a question of law appropriate for this Court's consideration." *Forbush*, 162 Idaho at 330, 396 P.3d at 1212 (quoting *Humphries*, 159 Idaho at 735 n.2, 366 P.3d at 1095 n.2).

Here, the district court determined as a matter of law that the facts were not sufficient to conclude that there was an agency relationship between ITD and the contractors. Despite the lack of analysis in the district court's decision, the record supports this conclusion. It is undisputed that ITD awarded Goodfellow Brothers the general contract to implement its Project plans. But this alone is not enough to establish a principal-agent relationship. *See id.* at 331, 396 P.3d at 1213 (holding that the "authority bestowed by a contract . . . is not dispositive when determining whether an agency relationship exists"). Rather, the "important factor is the control or right of control reserved by the [principal] over the functions and duties of the agent." *Id.* (alteration in original) (quoting *Koch v. Elkins*, 71 Idaho 50, 57, 225 P.2d 457, 462 (1950)). While ITD exerted some control over the functions and duties of Goodfellow Brothers and Avista, we agree with the district court that the evidence in the record was insufficient for the district court to determine that a principal-agent relationship existed.

In his deposition, Mike Jacobs, a representative for Goodfellow Brothers, testified that neither ITD nor DEA exercised control over Goodfellow Brothers' work:

Q. Okay. With regard to DEA's role, did they control the construction schedule for the project?

A. No.

Q. Who controlled that?

A. GBI [Goodfellow Brothers].

Q. Did DEA control what equipment was used when?

A. No.

Q. Who did?

A. GBI.

Q. Did DEA control what equipment was used where?

A. No.

Q. And who did?

11

A. GBI.

South Hill points to facts in the record demonstrating that Goodfellow Brothers met weekly with ITD, provided a three-week forward-looking schedule identifying work that would be performed during that period, and was provided with the final plans defining the order of work that Goodfellow Brothers was contractually obligated to perform. Therefore, it argues that Goodfellow Brothers was not an independent contractor but rather ITD's "eyes and ears on the ground for the Project." We disagree. Requiring a subcontractor to inform the general contractor when its work would be done and confirming whether it was on schedule is a far cry from the right to control necessary to establish a principal-agent relationship.

Here, not only did Goodfellow Brothers recognize that it controlled the construction schedule and management of the work onsite, it also controlled what, when, how, and where the equipment was used. DEA admitted the same. In the deposition of Tony Butler, a representative of DEA, Butler stated that DEA did not tell Goodfellow Brothers what equipment it should be using on the Project "because that's a means and method." Nor did DEA tell Goodfellow Brothers where to use various pieces of construction equipment on the project. While ITD and DEA may have specified the result they sought to achieve, they did not control the performance or method of performance; therefore, no agency relationship arose between ITD and Goodfellow Brothers. We conclude that any slight doubt resulting from the facts that South Hill asserts amount to no more than a "mere scintilla"; thus, it is insufficient to create a genuine issue of material fact on this point. *Moyer*, 174 Idaho at 973, 560 P.3d at 1120.

ITD had a similar relationship with Avista. In the deposition of another DEA representative, David Surh, he explained that DEA, the company that was hired by the State to oversee the Project, did not control Avista's work on the Project:

Q. So what was your -- did you have any sort of a formal relationship with Avista Corporation as it related to the project?

A. No.

Q. You didn't have any direction, authority or responsibilities that related to Avista?

A. No.

Q. Did you inspect any of Avista's work?

A. No.

Q. Did you approve any of Avista's work?

12

A. No.

Q. Did you communicate with Avista regarding any deviations from plans and specifications for the project?

A. I did not.

Q. Did DEA, to your knowledge?

A. Not to my knowledge.

This confirms that DEA, acting as ITD's agent, had little to no control over Avista's work as it related to relocating the pipeline close in proximity to South Hill's building. Likewise, Avista's representative, Timothy Harding, testified in his deposition: "You know, ITD suggests an alignment, but that's kind of where I suppose their design ends and where Avista standard practices take over."

ITD's relationship with KG&T was even more distant since Avista hired KG&T. DEA's representative, David Suhr, testified:

Q. So I'll try to run through this quickly. You didn't direct KG&T's work?

A. No.

Q. You didn't control KG&T's work?

A. No.

Q. You didn't inspect KG&T's work?

A. No.

Q. You didn't approve any of KG&T's work?

A. No.

Q. And you didn't have anything to do with any deviations from their work that might have been originally specified?

A. No. Huh-uh.

While ITD and DEA were involved in the Project in a supervisory capacity to ensure that the result of the final plans was achieved, they did not control how Goodfellow Brothers, Avista, or KG&T performed the work that was done. Therefore, we conclude that the record supports the conclusion that they maintained an independent contractor relationship at all times.

Because Goodfellow Brothers, Avista, and their subcontractors were not agents of ITD, their conduct is not imputed to ITD as a principal. Thus, any harm which might have occurred as a result of the Project was either the result of (1) the independent contractor's own negligence, and/or (2) an allegedly negligent plan by ITD. If the former is true, then South Hill should have

named Goodfellow Brothers, Avista, KG&T, and any other subcontractors as defendants in the present case, which it did not do. If the latter is shown to be true, then ITD is entitled to assert a plan immunity defense since Idaho Code section 6-904(7) grants immunity for an allegedly negligent plan or design. However, as will be discussed below, to successfully raise this defense, ITD still must show that its change orders and other Project requirements, such as moving the gas line, were meaningfully reviewed. Until ITD has shown that it reviewed these aspects of the Project, genuine issues of material fact remain as to whether they are entitled to assert plan immunity.

**B. The district court erred in granting ITD's first motion for summary judgment on reconsideration.**

On December 7, 2021, ITD filed its first motion for summary judgment, contending that it was statutorily immune from any claim that "arises out of" the plan or design for construction or improvement to the highways pursuant to Idaho Code section 6-904(7). South Hill moved to strike portions of the Wuest declaration filed in support of summary judgment. Judge Buchanan granted South Hill's motion in part, striking several paragraphs of Wuest's declaration. Correspondingly, Judge Buchanan denied ITD's summary judgment motion, finding that genuine disputes of material fact existed both as to whether the Highway 95 improvement plans conformed to current design and engineering standards, and as to whether the plans were approved by the appropriate body in advance of construction.

Later, after ITD served its seventh and eighth supplemental discovery responses, which included the Allen and Hawkins declarations, Judge Berecz took over the case. ITD then moved for reconsideration of its first motion for summary judgment, which Judge Berecz granted. It is to this decision that we now turn.

*1. On reconsideration, the district court did not abuse its discretion by considering Wuest's declaration and its exhibits, and the additional Allen and Hawkins declarations.*

South Hill argues that Judge Berecz erred in considering portions of the Wuest, Allen, and Hawkins declarations on reconsideration. Specifically, South Hill argues that Wuest's declaration included inadmissible hearsay, was not properly authenticated, and was not based on personal knowledge. Likewise, South Hill asserts that the Allen and Hawkins declarations lack foundation, are not sufficiently based on personal knowledge, and were untimely; therefore, they should not

have been considered. Additionally, South Hill maintains that ITD's seventh and eighth supplemental discovery responses—submitted on November 22 and 23, 2022—were not timely.

With respect to motions for reconsideration, Idaho Rule of Civil Procedure 11.2(b)(1) states:

> A motion to reconsider any order of the trial court entered before final judgment may be made at any time prior to or within 14 days after the entry of a final judgment. A motion to reconsider an order entered after the entry of final judgment must be made within 14 days after entry of the order.

In deciding a motion to reconsider, a trial court has discretion to determine whether it will consider additional evidence submitted in support of the motion if the additional evidence is submitted late. *Ciccarello v. Davies*, 166 Idaho 153, 162, 456 P.3d 519, 528 (2019); *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 233, 494 P.3d 769, 781 (2021). Under this discretionary authority, a district court need not consider untimely evidence submitted in connection with a motion to reconsider. *Summerfield*, 169 Idaho at 233, 494 P.3d at 781.

The requirements for affidavits (or declarations) offered in support of or in opposition to a motion for summary judgment are set forth in Idaho Rule of Civil Procedure 56(c)(4), which provides:

> An affidavit used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Sworn or certified copies of all papers or parts of papers referred to in an affidavit must be attached to or served with the affidavit. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

We have held that these requirements "are not satisfied by an affidavit that is conclusory, based on hearsay, and not supported by personal knowledge." *State v. Shama Res. Ltd. P'ship*, 127 Idaho 267, 271, 899 P.2d 977, 981 (1995). A trial court's determination of whether testimony is offered in connection with a motion for summary judgment is admissible is reviewed under an abuse of discretion standard. *Gem State Ins. Co. v. Hutchison*, 145 Idaho 10, 15, 175 P.3d 172, 177 (2007) (citation omitted).

South Hill argues that the Wuest declaration does not satisfy Idaho Rule of Civil Procedure 56(c)(4) because it was not properly authenticated and contains numerous inadmissible hearsay statements. In ruling on South Hill's motion to strike, Judge Buchanan agreed, and struck paragraphs 10, 11, and 16 of Wuest's declaration. However, when ITD moved for reconsideration after Judge Berecz inherited the case, he overruled Judge Buchanan's previous ruling, determining

15

that Wuest's declaration was admissible when taken in context with the Allen and Hawkins declarations. Judge Berecz explained:

> While South Hill argues that there should be more specificity included in the declarations, the declarations provide a sufficient basis of personal knowledge. These three engineers testify through their declarations that they have personal knowledge of the project, that they were involved in the design review, and explain the process in both general and specific terms.

South Hill argues that Judge Berecz abused his discretion in admitting Allen's and Hawkins' late declarations and relying on them to grant ITD's motion for summary judgment.

Over the last five years, we have revisited the issue of how trial courts should handle untimely affidavits offered in support of motions for reconsideration. First, in *Ciccarello*, we considered a legal malpractice claim against Davies after Ciccarello was ousted as CEO of Lotus Vaping Technologies, LLC. 166 Idaho at 157, 456 P.3d at 523. Ciccarello timely disclosed his expert witness, Brian C. Larsen. *Id.* In response, Davies moved for summary judgment, arguing that Ciccarello had not proffered competent expert testimony to establish that Davies failed to meet the applicable standard of care. *Id.* Ciccarello then filed an additional declaration of Larsen, which he designated as a rebuttal expert disclosure. *Id.* at 158, 456 P.3d at 524. The district court granted summary judgment to Davies, holding that expert testimony was required on the issues of breach and proximate cause in a legal malpractice case to overcome a motion for summary judgment. *Id.* Ciccarello moved for reconsideration and filed an additional declaration from Larsen. *Id.* The district court denied the motion for reconsideration, finding the two later declarations of Ciccarello's expert were untimely for consideration at summary judgment. *Id.* Considering both declarations untimely under Rule 56, the district court entered a final judgment dismissing all of Ciccarello's claims. *Id.* On appeal, we affirmed, holding that it was not an abuse of the district court's discretion to decline to consider Ciccarello's untimely expert declarations in support of his motion to reconsider. *Id.*

Next, in *Summerfield*, Summerfield brought a medical malpractice suit against St. Luke's under a *respondeat superior* theory when a doctor working for St. Luke's did not inform Summerfield that a laparoscopic cholecystectomy procedure had failed to remove a gallstone from his body. 169 Idaho at 224–25, 494 P.3d at 772–73. Trial was set for November 19, 2019, with the deadline to submit expert witnesses on June 24, 2019. However, Summerfield did not disclose his expert witness until June 26, 2019. *Id.* at 225, 494 P.3d 773. St. Luke's moved for summary judgment, asserting Summerfield could not establish a cause of action because its expert was not

16

familiar with the standard of care required of general surgeons who perform laparoscopic cholecystectomies. *Id.* After Summerfield's expert submitted two affidavits, the district court granted St. Luke's motion for summary judgment, finding that the expert did not show knowledge of the applicable standards of care. *Id.* at 225–26, 494 P.3d at 773–74. Summerfield filed a motion for reconsideration and attached a third affidavit from his expert. *Id.* at 227, 494 P.3d at 775. The district court initially decided to consider this third affidavit under the assumption that it had to consider this new evidence, but after the publication of our decision in *Ciccarello*, *sua sponte* rescinded its order granting Summerfield's motion for reconsideration and reinstated summary judgment in favor of St. Luke's. *Id.* at 227–28, 494 P.3d at 775–76. On appeal, we found *Ciccarello* directly on point and affirmed. *Id.* at 233–35, 494 P.3d at 781–83. Notably, we explained that, "while a motion for reconsideration is a safety valve to protect against legal and factual errors, it is not intended to be a mechanism that encourages tactical brinkmanship or a lack of diligence." *Id.* at 234, 494 P.3d at 782. Thus, this Court held that the district court did not abuse its discretion by reversing its decision to grant Summerfield's motion for reconsideration and reinstating judgment for St. Luke's. *Id.*

With these rulings in mind, we similarly conclude that, Judge Berecz did not abuse his discretion by considering the Wuest, Allen, and Hawkins declarations. Just as trial courts have discretion to *exclude* untimely evidence, they also have discretion to *consider* such evidence. *See Rhodehouse v. Stutts*, 125 Idaho 208, 213, 868 P.2d 1224, 1229 (1994) ("The decision to extend time to supplement an affidavit is within the sound discretion of the trial court."). Judge Berecz rejected Judge Buchanan's earlier determination that Wuest's declaration included conclusory statements and lacked the specifics of personal knowledge. Instead, Judge Berecz determined that Allen's and Hawkins' declarations not only corroborated Wuest's declaration, but they also "provide[d] the detail of personal knowledge Judge Buchanan found lacking." *See generally Carnell v. Barker Mgmt., Inc.*, 137 Idaho 322, 329, 48 P.3d 651, 658 (2002) (recognizing that it is within a trial court's discretion to consider a secondary, supplemental affidavit in reconsidering a grant of summary judgment). Furthermore, while Judge Buchanan considered the discovery disclosures as late based on the earlier October trial setting, Judge Berecz determined that these disclosures were timely even considering the original scheduling order, stating "[t]his [c]ourt

agrees that the pretrial order has not been violated by ITD's disclosures."[4] While it is clear that the two judges presiding over this case may have viewed the matter differently, they made their respective decisions at different phases of the case—after considerable time had passed and further discovery was completed. Therefore, we cannot find an abuse of discretion in either judge's ruling. Indeed, it is hardly unusual for two competent district judges—both acting consistently with the applicable legal standards—to exercise their discretion in different, but legally appropriate ways. Accordingly, we affirm Judge Berecz's decision to consider the contested declarations and exhibits.

2. *There is no genuine dispute of material fact that ITD's Policies properly delegated authority to review and approve the highway improvement plans and designs.*

South Hill argues that the highway plan and design in this case were improperly reviewed and approved by Allen and Hawkins, the ITD District Engineer and Operations Engineer for the Project. South Hill maintains that the district court erred in holding that certain ITD Policies, specifically Policy 4001 and Policy 5001 ("the Policies"), and Section 160.00 of the Roadway Design Manual properly delegated review and approval authority to the project engineers. Therefore, South Hill maintains that ITD cannot assert a design immunity defense under the "approved in advance of construction" prong of Idaho Code section 6-904(7).

The Policies at issue were enacted pursuant to Idaho Code section 40-314, which provides that "[t]he [Idaho transportation] board shall: . . . (3) [e]xercise any other powers and duties, including the adoption of rules and regulations, deemed necessary to fully implement and carry out the provisions of this title . . . ." I.C. § 40-314(3). Among the Board's enumerated powers is its authority to approve and determine the final plans, specifications and estimates for state highway projects, and to enter contracts for state highway projects. I.C. § 40-310(7). Pursuant to the Board's authority under Idaho Code section 40-314 to adopt rules and regulations, the Board implemented Policy 4001, which delegated the Board's authority to sign and execute contracts to the Director of ITD or a delegate. Pursuant to Policy 4001, "[t]he Director or delegate shall approve contracts, agreements, and grants, and is authorized to sign all contracts, agreements, and grants required for the proper functioning of the Idaho Transportation Department." Policy 5001 implements Policy 4001 and specifies that "Plans, Specifications and Estimate (PS&E) shall be

---

[4] While both parties reference the scheduling order in their briefing, the order was not included in the record for our review.

18

approved by District Engineer *or delegate* prior to bidding and advertisement by the Contracting Services section." (Emphasis added). Finally, ITD Roadway Design Manual section 160.00, entitled "Approval Responsibility," provides that "District Engineers shall sign the title sheet of the plans and other documents approved by the District Engineer for ITD."

South Hill maintains that Policy 4001 is a "ministerial delegation" intended to facilitate the day-to-day operations but does not delegate the Board's duty to review and approve highway plans. Likewise, South Hill argues Policy 5001 says nothing about delegating the authority to review and approve plans in advance of construction; rather, it outlines the contracting requirements prior to bidding on a project. This is not how we read the Policies.

While the Policies do not expressly state that review and approval authority has been delegated to ITD's project engineers, that is the unavoidable implication of the language in the Policies. Under Policy 4001, the Board has authority to approve highway construction contracts and can delegate the same to the Director, who can in turn delegate this authority to district engineers. Under Policy 5001, district engineers can further delegate this authority to approve plans, specifications, and estimates as they see fit. This language of "Plans, Specifications and Estimate (PS&E) shall be approved" is the same language used in Idaho Code section 40-310(7), whereby the Board has authority to "[a]pprove . . . the final plans, specifications and estimates for state highways." This is no coincidence. These Policies strongly indicate that the Board, consistent with the statutory directive, intended to delegate its approval authority to the Director and his delegates. Included within the act of "approval" is necessarily a review of the plans. Additionally, under ITD Roadway Design Manual Section 160.00, the Project plans must be signed by those authorized to grant approval.

We conclude from the record that all these requirements were satisfied. ITD had the authority to approve the construction plans, that power was properly delegated to Allen, Allen further delegated that power to Hawkins, and Hawkins affixed his signature to the final plans. Thus, with the Policies being considered in ITD's motion for reconsideration, there remains no dispute of material fact that the Project was approved in advance of construction by the governmental entity or other administrative agency. Despite our conclusion that the project engineers had authority to approve the Project plans, this does not end our immunity inquiry. As we explain below, the "approved in advance of the construction" exception to immunity still

19

requires that the final plans be "*meaningfully reviewed.*" *See Grabicki ex rel. Thompson v. City of Lewiston*, 154 Idaho 686, 694, 302 P.3d 26, 34 (2013) (emphasis added).

      3.   *The district court erred in finding no dispute of material fact regarding whether ITD's change orders and the gas line relocation were meaningfully reviewed.*

South Hill next argues that there is a dispute of material fact as to whether the final plan and subsequent change orders were "meaningfully" reviewed by ITD to be entitled to plan immunity. If there remains a genuine question of material fact as to whether the actions taken by ITD were properly approved, the district court would have erred in granting summary judgment to ITD.

As previously noted, the ITCA is construed to favor liability and to limit exceptions. *Grabicki*, 154 Idaho at 691, 302 P.3d at 31 (citation omitted). In *Grabicki*, we set forth "a two-step analysis for reviewing a motion for summary judgment based upon an immunity defense under the ITCA." *Id.* at 690, 302 P.3d at 30. First, this Court determines whether the plaintiffs' allegations state a cause of action for which a private person or entity would be liable for money damages under the laws of the state of Idaho. *Id.* (citation omitted). Second, this Court "determine[s] whether an exception to liability under the ITCA shields the alleged misconduct from liability." *Id.* at 690–91, 302 P.3d at 30–31. While the two steps have been labelled as "first" and "second," we have held that a reviewing court is "free to consider issues related to duty and immunity under the ITCA in the order of its choosing." *GSN Cap., LLC v. Shoshone City & Rural Fire Dist.*, 173 Idaho 345, 352, 541 P.3d 703, 710 (2024).

In applying this test in *Grabicki*, we determined that the City of Lewiston was not entitled to design immunity where the City had negligently designed and installed a storm water drain system adjacent to Thompson's property that caused storm water runoff to flow onto his property and damage it. 154 Idaho at 689, 695, 302 P.3d at 29, 35. We concluded that the City had not identified any relevant engineering or design standards; thus, it could not meet its burden under the "approved in advance of construction" prong of Idaho Code section 6-904(7). *Id.* at 693–95, 302 P.3d at 33–35. This Court explained:

> Under the plain language of the statute, the approval required to trigger the protection of the ITCA's design exception provision is more than blanket approval to proceed with a project. Rather, it plainly requires *meaningful review of the actual plan or design*. Further, the plan or design must be *sufficiently detailed* that by using it, one could accomplish the intended construction or improvement.

20

*Id.* at 694, 302 P.3d at 34 (emphasis added). We held that because the City had only provided meeting minutes indicating oral approval for funding the project, but pointed to no evidence demonstrating that the City considered the details of the gutter replacement project, a material question of fact existed regarding whether there was "meaningful review." *Id.* at 694–95, 302 P.3d at 34–35. Because a material question of fact existed regarding whether there was "meaningful review," summary judgment should not have been granted. *Id.*

Akin to *Grabicki*, South Hill has stated a cause of action for negligence. The question then is whether ITD is immune from liability under any exception to the ITCA. While Wuest, Hawkins, and Allen all testified that they were involved in the "documented multi-level review of the plans," it is not clear from the record if ITD reviewed those aspects of the plan that applied to relocating the gas line. Just as in *Grabicki*, material questions of fact exist as to whether ITD meaningfully reviewed any plans regarding excavating, moving a utility line, and backfilling a trench along the Project's path. Wuest's declaration merely points out that "Avista was not an agent or employee of ITD. Avista was involved in this Project only because the Project alignment required that Avista relocate its natural gas line." Wuest's declaration does not address whether the plan to move the gas line along the "Project alignment" was reviewed at all, much less meaningfully reviewed. The Allen and Hawkins declarations do not acknowledge Avista's involvement in the Project nor include any indication that ITD reviewed plans to move a gas line that required digging a trench only 18 inches from a private building. The hundreds of pages of engineering reports submitted by ITD in discovery, which includes calculations, depictions, and graphs detailing the Project's plans and specifications, might demonstrate that ITD properly reviewed those aspects of the plan that applied to moving the utility lines. However, such information was never disclosed to the district court. Therefore, we conclude that, absent any indication that the movement of the utility line was considered and reviewed as part of the final plans, an issue of material fact remains.

Also of concern are the "thirty-three change orders executed during the construction that were not part of the final plans," as well as other changes made on the fly during the Project that did not require official change orders, but may have resulted in damage to South Hill's Property. South Hill argues that these Project changes also required meaningful review for the State to be entitled to plan or design immunity.

There is nothing in the text of Idaho Code section 6-904, nor caselaw pointed to by either party, suggesting the level of review that change orders require and whether it is the same review

21

the initial plans receive. However, to conclude that such orders require no meaningful review of material changes to the original plan or design would be tantamount to permitting ITD or its subcontractors to override the approved plans in order to implement an *entirely different* plan, which was not subject to proper review. Of course, it is understood that complex construction projects often require minor changes not initially contemplated in the original plan; therefore, preserving room for some minor changes or adjustment to the plans is necessary. However, where a change is material and significant enough to effectively change the original plan to a new plan, those changes require review to be protected by immunity under Idaho Code section 6-904. Therefore, we conclude that Project changes that rise to the level of a material change of the original plan require the same meaningful review articulated in *Grabicki*.

We note the well-reasoned view expressed by the dissent, which would "overrule" the *Grabicki* standard we have followed here if it requires that "the plan or design must be sufficiently detailed that by using it, one could accomplish the intended construction or improvement." Importantly, this opinion does not expand the holding in *Grabicki* beyond its original bounds. Indeed, the quoted language objected to above by the dissent comes straight from the holding of *Grabicki*. 154 Idaho at 694, 302 P.3d at 34. It is also worth noting that *Grabicki* has been settled law since 2013; there has been ample time to remedy its effect if the legislature believed it did a disservice to its intent in adopting Idaho Code section 6-904(7). Therefore, we do not believe it can be fairly maintained that this opinion has "rewritten any legislative enactments," as the dissent suggests.

In sum, the record on appeal does not indicate that ITD meaningfully reviewed the plan to create a bypass road, which would require moving the utility line, excavating 18 inches from an older building's foundation, backfilling the excavated area, and compacting the soil with heavy equipment. This material issue of fact remains unanswered by the record. Therefore, we conclude that the district court erred in determining there was no genuine dispute of material fact whether ITD was entitled to immunity. Accordingly, we reverse the court's decision to grant the first motion for summary judgment and remand for further proceedings.

C. **The district court erred, in part, in granting ITD's second motion for summary judgment.**

ITD's second motion for summary judgment sought dismissal of South Hill's (1) constitutional claims, (2) nuisance claim, and (3) trespass claim. Additionally, ITD sought clarification whether the claim for removal of lateral support was a strict liability claim and

whether plan or design immunity might be available as a potential defense. On appeal, South Hill does not contest the district court's dismissal of the constitutional claims but does challenge the district court's rulings on its nuisance, removal of lateral support, and trespass claims. We will address each in turn.

1. *The district court erred in concluding that South Hill's nuisance claim fails as a matter of law.*

South Hill argues that the district court erred when it concluded that South Hill's nuisance claim fails as a matter of law. ITD maintains that because the district court correctly concluded there was no "element of persistence" to South Hill's claim, it cannot prove a nuisance claim.

Nuisance actions are governed by Idaho Code section 52-111, which reads:

> Anything which is injurious to health or morals, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance and the subject of an action. In the case of a moral nuisance, the action may be brought by any resident citizen of the county; in all other cases the action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance; and by the judgment the nuisance may be enjoined or abated, as well as damages recovered.

I.C. § 52-111. We have recognized that "early cases from this Court and other authority indicate that nuisances have an element of persistence." *Spirit Ridge Mineral Springs, LLC v. Franklin County*, 157 Idaho 424, 427, 337 P.3d 583, 586 (2014). To satisfy this element of persistence, we have held that the nuisance must be ongoing and continuing. *Id.*

On appeal, South Hill maintains that *Spirit Ridge* is inapplicable since that case involved "an action for nuisance abatement and an injunction, not for damages already caused by a nuisance." In *Spirit Ridge*, the plaintiff's complaint requested abatement of a private nuisance and an injunction against a gun range operated by Franklin County adjacent to its property. 157 Idaho at 424–25, 337 P.3d at 583–84. Notably, however, the plaintiff did not seek damages. *See id.* This is a key distinguishing factor between *Spirit Ridge* and the case at hand. While South Hill concedes that the nuisance has abated, its complaint does not seek an abatement of the nuisance; rather, it seeks damages in excess of $10,000 for the damages caused by the nuisance.

In conducting its nuisance analysis on summary judgment, the district court stopped its analysis once it determined that the nuisance had abated. However, Idaho Code section 52-110 specifically allows a party to recover damages for a nuisance even after it has abated. Accordingly, we reverse the district court's entry of summary judgment on South Hill's nuisance claim.

23

However, we note that because South Hill brings its nuisance claim as a tort action, our holding does not preclude the possibility that ITD may still be entitled to immunity for South Hill's nuisance claim. Our reversal is solely based on the district court's erroneous holding that all claims for damages from a nuisance must fail once the nuisance has abated.

> 2. *The district court correctly held that Idaho Code section 55-310 is not a strict liability statute.*

Next, South Hill maintains that the district court erred when it granted summary judgment to ITD on South Hill's claim for relief under Idaho Code section 55-310. South Hill maintains that section 55-310 imposes strict liability for property owners who damage a neighbor's property through excavation. We do not agree.

Idaho Code section 55-310 provides that,

> Each coterminous owner is entitled to the lateral and subjacent support which his land receives from the adjacent land, subject to the right of the owner of the adjoining land to make proper and usual excavations on the same for purposes of construction, on using *ordinary care* and skill, and taking *reasonable precautions* to sustain the land of the other, and giving previous reasonable notice to the other of his intention to make such excavation.

I.C. § 55-310 (emphasis added). While it is true that, at common law, "the right of a landowner to the support of his land was absolute," this was only germane to land that "remained in its natural state." *Lateral Support*, 6 Stan. L. Rev. 104, 106 (Dec. 1953). Strict liability principles do "not apply to lateral support required by artificial additions on the supported land." Restatement (Second) of Torts § 817 cmt. d (1979). Rather, "liability in respect to lateral support that is not naturally necessary, such as structures on land, . . . depends upon rules of the law of negligence." *Id.* cmt. b. Given that the plain language of section 55-310 uses terms sounding in negligence, such as "ordinary care" and "reasonable precautions," this strongly suggests that the legislature did not intend to create a strict liability standard.

We conclude that Idaho Code section 55-310 is consistent with common law principles on this point and imposes a negligence standard when a party's withdrawal of lateral support causes harm to artificial conditions on the other's land. This reading is in harmony with the plain language of section 55-310, requiring the use of "ordinary care and skill, and taking reasonable precautions." I.C. § 55-310. South Hill's Building is an improvement to real property (i.e., it is not in its natural state); thus, a negligence standard is applicable to any damage to the Building. Consequently, we

24

affirm the district court's determination that Idaho Code section 55-310 does not create a strict liability cause of action.

> 3. *The district court correctly concluded that violations of Idaho Code sections 55-310 and 6-202 are subject to the immunity provisions of the ITCA.*

South Hill argues that Idaho Code section 55-310 (right to lateral and subjacent support) and section 6-202 (civil trespass) should not be subject to immunity under the ITCA. To support its position, South Hill points to *Woodworth v. State ex rel. Idaho Transportation Board*, 154 Idaho 362, 366, 298 P.3d 1066, 1070 (2013), for its assertion that statutory violations do not qualify for design immunity. In response, ITD concedes that certain causes of action are not subject to the ITCA; however, it points out that there is no caselaw indicating that Idaho Code sections 55-310 and 6-202 are outside the scope of immunities embodied in the ITCA. ITD also argues that, even if South Hill's shop was damaged by the removal of lateral support, ITD was not the party that removed the support; rather, its independent contractors were. Likewise, any trespass that occurred was caused by the contractors who carried out the work.

In *Woodworth*, Brian Woodworth was struck by a vehicle while crossing a street in Nampa, Idaho. *Id.* at 363, 298 P.3d at 1067. He sued the Idaho Transportation Board and ITD under a common law negligence claim for failure to maintain a pedestrian crosswalk. *Id.* at 363, 365, 298 P.3d at 1067, 1069. The district court granted summary judgment, finding that the State was entitled to immunity under Idaho Code section 6-904(7). *Id.* at 363, 298 P.3d at 1067. On appeal, Woodworth maintained that the case did not invoke the immunity provision in Idaho Code section 6-904(7) because his cause of action did not arise from a claim that the State negligently planned or designed the intersection. *Id.* at 365, 298 P.3d at 1069. This Court disagreed, affirming the district court's decision that Woodworth's action arose out of his claim that the State failed to design, construct, reconstruct, alter, repair or maintain the intersection because the claim originated or stemmed from a plan or design. *Id.* However, this Court did note that, while design immunity is "broad and long lasting, it does not absolutely bar negligence claims related to the plan or design of a State highway where the plaintiff can point to a specific statute or mandatory provision of the [Manual on Uniform Traffic Control Devices] that has been violated." *Id.* at 366, 298 P.3d at 1070.

While "[n]ot all actions are covered by the ITCA," *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 557, 212 P.3d 982, 987 (2009), our past decisions are clear that the ITCA is applicable to claims based in negligence or wrongful conduct, *see City of Chubbuck v. City of Pocatello*, 127 Idaho 198, 203, 899 P.2d 411, 416 (1995). Just as we held, *supra*, concerning South Hill's section

25

55-310 strict liability claim, a civil trespass claim is similarly subject to the ITCA since an "action for trespass is, at its core, a tort action." *Bliss v. Minidoka Irrigation Dist.*, 167 Idaho 141, 150, 468 P.3d 271, 280 (2020). Inasmuch as claims based on Idaho Code sections 55-310 and 6-202 are sound in tort, they are subject to the immunity granted under the ITCA.

**D. The district did not err in granting ITD's motion to bifurcate the trial.**

South Hill's final argument is that this Court should reverse the district court's order granting ITD's motion to bifurcate the trial. The decision whether to bifurcate a trial is "in the discretion of the trial court." *Rueth v. State*, 103 Idaho 74, 80, 644 P.2d 1333, 1339 (1982). The applicable standard for bifurcation is outlined in Idaho Rule of Civil Procedure 42(b) whereby,

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any right to a jury trial.

I.R.C.P. 42(b). Exercising her discretion on this issue, and finding good cause for bifurcation, Judge Buchanan granted ITD's motion to bifurcate the trial. On appeal, South Hill points out that the express language of the rule does not contemplate bifurcation to address an affirmative defense. While defenses are not specifically enumerated in the list above, we conclude that a defense can be reasonably read to be among the "separate issues" encompassed by Rule 42(b).

Based on the record before us, we conclude that Judge Buchannan's decision to first adjudicate ITD's design immunity defense was proper. It allowed for an expeditious and economical resolution of a potentially dispositive issue that otherwise would have required a seven-day trial, as contemplated by the attorneys. Since the immunity issue is capable of being fully litigated in one or two days, bifurcation allowed the court to preserve up to five full workdays. Because in this instance litigation of design immunity might preclude the need for South Hill to put on its full case-in-chief and save significant time and resources, we affirm the district court's decision to bifurcate the presentation of ITD's immunity defense.

**E. ITD is not entitled to Attorney Fees.**

Finally, ITD requests costs and reasonable attorney fees on appeal pursuant to Idaho Code sections 12-117 and 12-121. "Idaho code section 12-117 allows for the award of attorney fees to the prevailing party 'in any proceeding involving as adverse parties a state agency or a political subdivision' if this Court 'finds that the nonprevailing party acted without a reasonable basis in fact or law.' " *Hill v. Blaine County*, 173 Idaho 856, 869, 550 P.3d 264, 276 (2024) (emphasis

omitted) (quoting I.C. § 12-117). Under Idaho Code section 12-121, a court may award attorney fees to the prevailing party if it "finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Here, both sides only prevailed in part. Moreover, because we are remanding this case for further proceedings, we cannot say whether ITD will ultimately prevail. Accordingly, ITD's request for attorney fees is denied.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is vacated. We affirm the district court's summary judgment orders in part and reverse in part. We reverse the district court decision on reconsideration granting ITD's first motion for summary judgment because there are genuine issues of material fact as to whether (1) the change orders materially changed the original plans, including moving the gas line, and, if so, (2) whether those changes were meaningfully reviewed and approved by ITD. We also reverse the court's order dismissing South Hill's nuisance claim in the second motion for summary judgment. The district court's remaining orders are affirmed. Therefore, we remand for further proceedings consistent with this opinion.

Chief Justice BEVAN, Justices BRODY and ZAHN CONCUR.


MEYER, J., dissenting.

While I concur in much of the analysis in the Court's opinion, I dissent regarding Section IV.B.3. In concluding that genuine issues of material fact exist concerning meaningful review of the Idaho Transportation Department (ITD) plans related to the Avista utility line and change orders, the majority merges the two distinct plan and design immunity avenues into one gnarled traffic jam. I fear this interpretation will gridlock the plan and design immunity analysis and essentially eliminate immunity based on approval in advance of the plans or design. Furthermore, the majority veers off course from its interpretive role by placing extra obstacles on the road mapped out by Idaho Code section 6-904(7), effectively crossing into the lane of legislative policy making.

To review, the Idaho Tort Claims Act (ITCA) abrogates common law sovereign immunity from liability for torts committed by governmental entities. However, it retains immunity in certain circumstances, such as for claims arising out of a plan or design for highway construction. Relevant here, Idaho Code section 6-904(7) excepts government entities from liability claims arising out of

27

plans or designs related to building highways and similar infrastructure if those plans or designs meet certain criteria:

> EXCEPTIONS TO GOVERNMENTAL LIABILITY. A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
>
> . . . .
>
> 7. Arises out of a plan or design for construction or improvement to the highways, roads, streets, bridges, or other public property where such plan or design is prepared in substantial conformance with engineering or design standards in effect at the time of preparation of the plan or design or approved in advance of the construction by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval.

I.C. § 6-904(7). This Court previously interpreted subsection (7) in *Lawton v. City of Pocatello*, explaining that there are two conditions the government entity must establish for immunity under section 6-904(7): "(1) the existence of a plan or design that was (2) *either* prepared in substantial conformance with existing engineering or design standards *or* approved in advance of construction by the legislative or administrative authority." 126 Idaho 454, 459, 886 P.2d 330, 335 (1994).

In *Grabicki v. City of Lewiston*, 154 Idaho 686, 694, 302 P.3d 26, 34 (2013), this Court interpreted the "approved in advance" provision to require "meaningful review" by the legislative or administrative authority. But context matters. Though the majority latches onto lessons from *Grabicki* to support its newly and greatly expanded meaningful review requirement, *Grabicki* does not compel such a result, and the language of section 6-904(7) does not contemplate it. The facts in *Grabicki* are not akin to any of the facts of this case other than public construction occurring, and damage to surrounding property being alleged. In this appeal, the alleged damage was caused by the physical construction of the public project, while in *Grabicki*, the damage was alleged to have been caused by the faulty design of the public project.

In *Grabicki*, the City of Lewiston changed its stormwater drainage system at an intersection from a valley gutter system to a "bubble-up" system. *Id.* at 689, 302 P.3d at 29. The plaintiff claimed that the negligently designed new system failed to properly contain storm runoff, resulting in damage to its property. *Id.* The assistant city engineer designed the new system, and the plan consisted of a schematic of the intersection and a detail page. *Id.* The parties did not present evidence related to "specific engineering standards or requirements" governing the project, but the plaintiff presented expert opinion evidence that the "plan and design failed to meet any standard."

28

*Id.* The City sought summary judgment, asserting immunity, and provided affidavits that it claimed demonstrated that the design had been approved before construction began. *Id.* Specifically, city council minutes showed that the city accepted a bid to complete the project. The plaintiff submitted affidavits of the mayor and two city council members who had no recollection of discussing the project. In addition, the city manager testified by affidavit that while the city engineer had the authority to approve some projects, "substantial projects" required approval from the council or city manager. *Id.*

Contrast the *Grabicki* facts to those in the present case in which Justin Wuest and other ITD engineers discussed the years-long process for designing and approving the plans for the 1.3-mile highway improvement project in Bonners Ferry, which is the subject of this case. Seven years before the Project was put out for bid, the ITD Board approved the general concept for the Project. Reports and studies were prepared by and for ITD during the years of planning for the Project, including traffic studies, an environmental evaluation, stormwater reports, a recorded survey, and materials reports. Licensed professional engineers and professional land surveyors developed, reviewed, and approved preliminary design plans, and staff engineers and the resident engineer of ITD reviewed those design plans. The project itself was approved by the Board on Transportation in the Idaho Transportation Investment Programs and the U.S. Department of Transportation over the several years of development.

"After detailed and meaningful review" by ITD, according to Wuest, final plans and specifications were completed, and pages of the final plans were stamped and signed by a professional engineer. The final plans consisted of approximately 298 pages. According to Wuest, a licensed Professional Engineer and the Resident Engineer for District One who oversaw the Project, the final plans and design were in "substantial conformance with engineering or design standards in effect at the time of preparation of the plan and design." Ryan Hawkins, a licensed Professional Engineer and the Operations Engineer for ITD's District 1 region since July 1, 2022, and the District 1 Design Construction Engineer before July 1, 2022, personally reviewed the plans for the highway project at issue along with other ITD traffic engineers. Hawkins determined that the plans "conformed with the requirements set forth in ITD's Roadway Design Manual." Damon Allen is the District Engineer for ITD's District 1 region and has served in that role since 2007. He has the authority to review and approve plans or designs for proposed highway improvement projects pursuant to ITD Board polies and the Roadway Design Manual. According to Allen, the

"plans underwent a lengthy, multilevel review by ITD engineers." The review was overseen by Justin Wuest. Allen delegated the final plan coversheet approval authority to Ryan Hawkins.

The majority determined, and I concur, that there is no genuine issue of material fact that ITD policies properly delegated the authority to review and approve the highway project's plans and design. *See supra*, Section IV.B.2. As I indicated, however, I disagree with the majority's conclusion that genuine issues of material fact exist as to whether there was a meaningful review of the highway project's design and plans. The declarations of Wuest, Allen, and Hawkins clearly show that there was a lengthy, multilevel review of the plans and design by properly authorized personnel.

Back to *Grabicki*: the plaintiff and the city conceded that neither party identified any engineering or design standards that existed at the time the new stormwater drainage system was implemented; therefore, this Court held that the city could not meet its burden of showing an absence of a genuine issue of material fact on whether its plan conformed to a standard. 154 Idaho at 693–94, 302 P.3d at 33–34. This Court noted, however, that "[t]he other means of establishing immunity under the design exception is to show that the plan was given approval, prior to construction, 'by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval.'" *Id*. at 694, 302 P.3d at 34 (quoting I.C. § 6-904(7)). The evidence concerning approval offered by the city was that the city engineer and the director of public works approved the plan. *Id.* The city manager, however, stated that, while the city engineer would have had authority to approve some projects independently of the city manager or city council, she could not opine whether the stormwater drainage system plan at issue would have required a higher level of approval. *Id.* This Court held that genuine issues of material fact thus precluded summary judgment. *Id.* The city offered the city council's approval of a bid for the proposed work, but the former mayor and two council members had no recollection of discussing the project. *Id.* We noted that the city council's approval of a bid did not demonstrate that the city council actually approved the design plan for the new stormwater drain system. *Id.* This Court held that

> [u]nder the plain language of the statute, the approval required to trigger the protection of the ITCA's design exception provision is more than blanket approval to proceed with a project. Rather, it plainly requires meaningful review of the actual plan or design. Further, the plan or design must be sufficiently detailed that by using it, one could accomplish the intended construction or improvement. *Absent a record demonstrating that the City Council was aware of and considered the details of the*

*gutter replacement project,* meeting minutes showing an oral approval for funding several projects are insufficient. Thus, a genuine issue of material fact exists regarding whether the City Council approved the project within the meaning of Idaho Code § 6-904(7).

*Id*. at 694–95, 302 P.3d at 34–35 (emphasis added).

In *Grabicki*, there was a question whether the plan, consisting only of a schematic of the intersection and a detail page, was approved by the city's legislative body or another entity authorized to approve the plan. *Id.* at 695, 302 P.3d at 35. We rejected the notion that the city council's oral approval of funding for several projects, including the one at issue, constituted approval. *Id*. at 694–95, 302 P.3d at 34–35. In so doing, we held that a meaningful review of an actual plan or design was required rather than mere approval to proceed. *See id.* In *Grabicki*, we did not define "meaningful review," except in context, and in context, meaningful review meant that the legislative body or authorized designee "was aware of and considered the details of the . . . project"; that is, it actually reviewed the plans or design of the project in the approval process. *See id.* In this context, it is important to remember that Idaho Code section 6-904(7), by its words, requires approval in advance; it does not require review, meaningful review, or in-depth review. It does not require consideration of details. The statute requires the plans or design to be "approved in advance," and while we held in *Grabicki* that approval "plainly" requires a "meaningful review of the actual plan or design," it was in the context of a case in which the governmental entity argued that approval for funding was enough to constitute approval of plans or design.

By contrast, in this case, the majority concludes that issues of material fact exist under the following circumstances:

> The question then is whether ITD is immune from liability under any exception to the ITCA. While Justin Wuest, Hawkins, and Allen all testified that they were involved in the "documented multi-level review of the plans" it is not clear from the record if ITD reviewed those aspects of the plan that applied to relocating the gas line. Just as in *Grabicki*, material questions of fact exist as to whether ITD meaningfully reviewed any plans regarding excavating, moving a utility line, and backfilling a trench along the Project's path. Wuest's declaration merely points out that "Avista was not an agent or employee of ITD. Avista was involved in this Project only because the Project alignment required that Avista relocate its natural gas line." Wuest's declaration does not address whether the plan to move the gas line along the "Project alignment" was reviewed at all, much less meaningfully reviewed. The Allen and Hawkins declarations do not acknowledge Avista's involvement in the Project nor include any indication that ITD reviewed plans to move a gas line that required digging a trench only 18 inches from a private building. The hundreds of pages of engineering reports submitted by ITD in

31

discovery, which includes calculations, depictions, and graphs detailing the Project's plans and specifications, might demonstrate that ITD properly reviewed those aspects of the plan that applied to moving the utility lines. However, such information was never disclosed to the district court. Therefore, we conclude that, absent any indication that the movement of the utility line was considered and reviewed as part of the final plans, an issue of material fact remains.

Also of concern are the "thirty-three change orders executed during the construction that were not part of the final plans," as well as other changes made on the fly during the Project that did not require official change orders, but may have resulted in damage to South Hill's Property. South Hill argues that these Project changes also required meaningful review for the State to be entitled to plan or design immunity.

There is nothing in the text of Idaho Code section 6-904, nor caselaw pointed to by either party, suggesting the level of review that change orders require and whether it is the same review the initial plans receive. However, to conclude that such orders require no meaningful review of any material changes to the original plan or design would be tantamount to permitting ITD or its subcontractors to override the approved plans in order to implement an *entirely different* plan, which was not subject to proper review. Of course, it is understood that complex construction projects often require minor changes not initially contemplated in the original plan; therefore, preserving room for some minor changes or adjustment to the plans is necessary. However, where a change is material and significant enough to effectively change the original plan to a new plan, those changes require review to be protected by immunity under Idaho Code section 6-904. Therefore, we conclude that Project changes that rise to the level of a material change of the original plan require the same meaningful review articulated in *Grabicki*.

*See, supra,* Section IV.B.3.The majority's interpretation of Idaho Code section 6-904(7) transforms the requirement from simply being "approved in advance" to requiring a thorough review of the plans, including detailed consideration of the potential consequences of particular construction actions or events. This review also includes the potential consequences of actions taken by other parties involved in the construction project. All of these considerations then extend to surrounding properties during the construction phase—not to mention the need to evaluate whether the design or plans will or could cause injury or damage after construction is complete.

These new requirements expand the simple requirement of approval in advance by the legislative or administrative body in section 6-904(7) into a super requirement that demands assessment before each discrete step of a construction project. In addition, this new super requirement extends to any change order "material and significant enough to effectively change the original plan to a new plan." And all this is gleaned from the phrase "approved in advance."

This reworking of the approved-in-advance arm of section 6-904(7) veers boldly into the legislative function of making policy. That is decidedly not the function of this Court. Many years ago, in *Verska v. Saint Alphonsus Regional Medical Center*, we stated:

> "[W]here a statute or constitutional provision is plain, clear, and unambiguous, it 'speaks for itself and must be given the interpretation the language clearly implies.'" . . . "We must follow the law as written. If it is socially or economically unsound, the power to correct it is legislative, not judicial."
>
> . . . The legislative power is vested in the senate and house of representatives, Idaho Const. art. III, § 1, not in this Court. . . ."The wisdom, justice, policy, or expediency of a statute are questions for the legislature alone."

151 Idaho 889, 895, 265 P.3d 502, 508 (2011) (cleaned up) (citations omitted).

> In *Grabicki*, acknowledging section 6-904(7) to be *un*ambiguous, we held that
>
> [u]nder the plain language of the statute, the approval required to trigger the protection of the ITCA's design exception provision is more than blanket approval to proceed with a project. Rather, it plainly requires meaningful review of the actual plan or design. Further, the plan or design must be sufficiently detailed that by using it, one could accomplish the intended construction or improvement.

154 Idaho at 694, 302 P.3d at 34.

Unambiguous statutes do not require statutory construction, but they do, from time to time, require interpretation. I agree that it is reasonable and within the province of this Court to interpret "where such plan or design is . . . approved in advance" to include "meaningful review." The definition of "approve" is "1. To give formal sanction to; to confirm authoritatively. 2. *Parliamentary law*. To adopt." *Approve*, Black's Law Dictionary (12th ed. 2024). For a legislative body to give formal sanction to or to confirm authoritatively the plans or design of a highway construction project, they must include a meaningful review of the actual plan or design. Without such actual (i.e., meaningful) review, the approval would simply be a rubber stamp.

However, I cannot agree that "meaningful review" requires that "the plan or design must be sufficiently detailed that by using it, one could accomplish the intended construction or improvement." *See Grabicki*, 154 Idaho at 694, 302 P.3d at 34. The statute requires the plans or design to be approved in advance; it does not include any requirements as to the content of the plans or design unless the other option for immunity is being followed, that of "substantial conformance with engineering or design standards in effect at the time of preparation of the plan or design . . . ." I.C. § 6-904(7). Moreover, the statute does not require as part of the approval process proof that the legislative body considered whether any discrete step of the construction

process might potentially cause damage to neighboring property. Whether it should is not a question for us; as we noted in *Verska*, "The wisdom, justice, policy, or expediency of a statute are questions for the legislature alone." 151 Idaho at 895, 265 P.3d at 508 (citation omitted).

The majority overlooks that section 6-904(7) provides, as a matter of legislative policy, immunity from claims arising out of the plans or design for highway construction. Section 6-904(7) contains the conditions on which immunity is granted; it is not for us to decide whether the conditions are adequate. While we are obliged to construe immunity narrowly, we are equally obliged to refrain from rewriting legislative enactments.

I would thus overrule *Grabicki* to the extent it requires more than actual or meaningful review to approve in advance highway construction plan or design, and I cannot join the majority in extending section 6-904(7) to include exacting review and consideration standards for plans and material change orders.

For these reasons, I respectfully dissent.